UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| MELISSA COHEN, derivatively on behalf of CARDINAL HEALTH INC.,   : <br><br> Plaintiff,   : <br><br> v.   : <br><br> COLLEEN F. ARNOLD, CARRIE S. COX, CALVIN DARDEN, BRUCE L. DOWNEY, PATRICIA S. HEMINGWAY HALL, MICHAEL C. KAUFMANN, GREGORY B. KENNY, NANCY KILLEFER, J. MICHAEL LOSH, and GEORGE S. BARRETT,   : <br><br> Defendants,   : <br><br> and   : <br><br> CARDINAL HEALTH INC.,   : <br><br> Nominal Defendant.   : | Case No. 2:19-cv-2491 <br><br><br> **AMENDED VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES** <br><br><br> **<u>DEMAND FOR JURY TRIAL</u>** |

Plaintiff Melissa Cohen ("Plaintiff") brings this action on behalf of nominal defendant Cardinal Health, Inc. ("Cardinal Health" or the "Company") against certain current members of its Board of Directors (the "Board") and a former board member and executive officer, and alleges upon personal knowledge as to her own acts, and as to all other matters upon information and belief as follows:

## <u>NATURE OF THE ACTION</u>

1.      This derivative action arises from Cardinal Health's Board's actions in failing to monitor and knowingly causing and permitting the Company to engage in over a decade of improper and illegal distribution of controlled substances.  Cardinal Health, under the Board's supervisions, distributes highly addictive pharmaceuticals to entities that it knew or should have known were selling these pharmaceuticals for illicit use.

2.      Cardinal Health is one of the largest distributors of opioids in the United States. Cardinal Health and its two biggest competitors, McKesson and AmerisourceBergen, distribute more than 85% of all prescription drugs in the United States and play a key role in flooding the markets with prescription opioids.

3.      The Board was content to pay settlement after settlement to federal and state government agencies rather than implementing and overseeing a system that would help stem the distribution of opioids to unauthorized users.  As the opioid crisis continued to grow and death rates continued to rise, Cardinal Health became the target of over 1,000 lawsuits, alleging that Cardinal Health was knowingly participating in the largest drug crisis in United States history by distributing opioid pain medications to the wrong hands.

4.      Most recently, Cardinal Health was named as a defendant in over 60 lawsuits brought by numerous cities, counties and states nationwide that were coordinated as a multi-

district litigation in the Northern District of Ohio (the "MDL") alleging that Cardinal Health allowed the distribution of opioid to customers that it knew or should have known were not selling them for a proper purpose. These actions were not simply focused on Cardinal Health's prior bad acts in 2012, but alleged the Company had engaged in repeated conduct that continued to result in opioids being illegally distributed to unauthorized users.

5. The first of the MDL trials was set to begin on October 21, 2019. On the eve of trial Cardinal Health along with its co-defendants reached an agreement to settle this "bellwether" case for $260 million – $66 million of which is owed by Cardinal Health (the Bellwether Settlement").

6. Cardinal Health and its co-defendants have also reached a preliminary global settlement agreement with four state attorneys general for $47 billion - $5.63 billion of which would be owed by Cardinal Health (the "Global Settlement"). In addition to the cash payout, Cardinal Health is to provide free distribution of drugs used to treat overdoses. Even if the proposed settlement succeeds, Cardinal Health could still face opt out actions that will cost millions to defend and may potentially cost the Company billions to resolve (the "Opt Out Liability").

7. On November 7, 2019, Cardinal Health issued a press release announcing a $5.6 billion charge in its first fiscal quarter 2020 in connection with its estimated liability in as part of the Global Settlement.

8. In the Global Settlement, Cardinal Health will suffer billions of dollars in damages, which was caused, in part, by the Board's failure to implement and oversee effective systems or controls to monitor the Company's improper distribution of opioids – despite

knowing full well of the Company's past substantially similar misconduct and the growing opioid addiction crisis.

9.      In light of numerous prior charges and settlements, the Board knew that continued illegal and improper conduct could subject the Company and its stockholders to grave consequences – including large fines and penalties and suspension of sales in lucrative markets. Rather than assuring these risks and red flags were addressed by management, the Board made a calculated decision to choose profits now over doing the right thing. The Board's conduct and failure to act resulted in direct breaches of fiduciary duties that caused significant harm to the Company.

10.     The Board has a duty to be vigilant in overseeing the Company's activities in connection with deciding whether a prospective customer can be trusted to deliver controlled substances only for lawful purposes. Cardinal Health is in a highly regulated industry, including being required to comply with the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. § 801, *et seq.* (the "CSA"), and the regulations promulgated thereunder, 21 C.F.R. Part 1300, *et seq.*, as overseen by the DEA. The Board knows it has a duty and obligation to oversee the distribution of its pharmaceuticals to ensure they are not being provided to those using them for an improper purpose.

11.     Defendants breached these duties by failing to implement an effective system to report suspicious orders, prevent diversion and ultimately halt the shipment of opioids in quantities they knew or should have known could not be justified and were indicative of serious overuse of opioids.

12.     The Board instead chose to rely on a system that led to numerous actions against the Company by the DEA without seeking meaningful improvements. This is true despite the

Company's prior DEA investigations and settlements for its failure to maintain effective controls against sales of opioid drugs to internet pharmacies.

13. The Board cannot claim that it was unaware of these issues as it has been the subject of repeated government actions and resulting settlements, and the growing opioid crisis is in the news circuit daily. The Board consciously failed to act after repeatedly learning about evidence of illegality – the proverbial "red flag." These red flags include:

a. The Company on September 29, 2008 entered into a Settlement and Release Agreement and Administrative Memorandum of Agreement with the DEA ("2008 DEA Settlement") wherein it agreed to "maintain a compliance program designed to detect and prevent diversion of controlled substances as required under the CSA and applicable DEA regulations." Cardinal Health also agreed to pay a civil fine of $34 million, which, at the time, was the largest fine in United States history associated with a DEA registration suspension. The 2008 DEA Settlement was a Board-level decision. The 2008 Settlement resolved several DEA claims related to the Company's controls against the diversion of controlled substances. The DEA issued three immediate suspension orders ("ISO") in 2007 in connection with three Cardinal Health distributions facilities that had been distributing suspiciously high amounts of opioids. And on January 30, 2008, the DEA issued an Order to Show Cause as to why the DEA should not revoke the Certificate of Registration at yet another facility. The Board oversaw the implementation of a "compliance program" as required by the 2008 DEA Settlement however, it failed to implement effective controls to ensure compliance with the CSA instead opting for a superficial program.

b. On February 2, 2012 the DEA issued a second ISO regarding the one of the same facilities as was cited in 2007. The ISO specifically noted "[d]espite the [2008 DEA

Settlement], the specific guidance provided to Cardinal by DEA, and despite the public information readily available regarding the oxycodone epidemic in Florida, Cardinal has failed to maintain effective controls against the diversion of controlled substances into other than legitimate medical, scientific, and industrial channels, in violation of [the CSA] 21 U.S.C. §§ 823(b)(1) and (e)(1)." Cardinal Health's Board once again took no real action. On May 15, 2012, Cardinal Health entered into a second settlement with the DEA to resolve the February 2, 2012 ISO, as well as the Company's failure (again) to detect and report suspicious orders, failure to maintain effective controls to detect diversion of controlled substances and failure to adhere to the provisions of the 2008 Settlement. Cardinal Health agreed to a two-year suspension of the facility's DEA registration to ship controlled medicines from the Lakeland, Florida distribution center (the "2012 Administrative DEA Settlement"). Cardinal Health again agreed to improve its anti-diversion procedures – but this agreement was plainly window dressing. The 2012 Administrative DEA Settlement was also a Board-level decision and was signed by the Company's Chief Legal and Compliance Officer.

c.      In 2012, the West Virginia attorney general sued Cardinal Health, the largest supplier of drugs in West Virginia, for distributing highly suspicious amounts of opioids into the state. In January 2017, the Company settled this lawsuit for $20 million, the largest pharmaceutical settlement in West Virginia's history. Throughout the course of this four-year litigation Cardinal Health chose to fight rather than take action to stem the distribution of opioids into the wrong hands. In order to push sales and increase revenues, the recidivist Board, chose to ignore the agreed upon "compliance program."

d.      In December 2016, Cardinal Health entered into a monetary settlement with the DEA in connection with the 2012 Administrative DEA Settlement (the "2016 DEA

Monetary Settlement"). The 2016 Monetary DEA Settlement was negotiated over the nearly four years since the 2012 DEA Administrative Settlement was reached. The $44 million 2016 DEA Monetary Settlement resolved Cardinal Health's admitted failure to comply with the terms of the 2008 DEA Settlement and its reporting requirements between 2009 and 2012 in Florida and Maryland and between 2011 and 2012 in New York City (through its subsidiary Kinray, Inc.). The 2016 DEA Monetary Settlement also resolved claims that Cardinal Health did not comply with CSA record keeping requirements in Washington.

14. Despite these actions, which should have served as red flags, the Board continued to allow Cardinal Health to continue with business as usual. As the sixteenth largest company by revenue in the U.S., with annual revenue of $137 billion in 2018, the Board's focus was on increasing revenues not slowing sales regardless of the death toll.

15. As a result, the Company is now a target of over 1,000 lawsuits including suits by state, county and city governments nationwide, which further damage the Company and its stockholders.

16. While the Board has been content to keep its head in the sand and collect illicitly gained profits, it is unable to continue to use the same excuse to claim it has no liability over the Company's actions. According to the Cardinal Health Fiscal 2018 Form 10-K filed with the SEC:

> Pharmaceutical wholesale distributors, including us, have been named as defendants in over 1,000 lawsuits relating to the distribution of prescription opioid pain medications. These lawsuits have been filed in various federal, state, and other courts by a variety of plaintiffs, which are primarily counties, municipalities and political subdivisions from 48 states. Plaintiffs also include state attorneys general, unions and other health and welfare funds, hospital systems and other healthcare providers. Of these lawsuits, 32 are purported class actions. The lawsuits seek equitable relief and monetary damages based on a variety of legal theories including various common law claims, such as negligence, public

nuisance, unjust enrichment as well as violations of controlled substance laws and various other statutes.

17. In addition, throughout this time several stockholders made demands on the Board to investigate the wrongdoing and make the Company whole. The Board formed committees, conducted investigations and determined nothing was wrong – while thousands of people continue to die from opioids shipped into the market by Cardinal Health.

18. Opioids are a diverse category of painkillers including oxycodone, hydrocodone and fentanyl. The potency and easy availability of opioids have made them popular as a prescribed and recreational drug. Controlling distribution of these highly addictive pain medications is a known component to combating this crisis effectively.

19. Cardinal Health is one of the few distributors of opioids in the country, and Defendants were well aware of the opioid epidemic, which has been repeatedly reported in the news for several years, and has been recognized as a public health emergency by numerous politicians, including the U.S. Congress. Defendants should have been on heightened alert for red flags following the 2007 Settlement and Cardinal Health's obligation to maintain effective controls against diversion of controlled substances because the opioid epidemic had become a major public health crisis, a fact repeatedly reported in the media. The opioid crisis is the result of a rapid increase in the use of opioid drugs in the United States since 1999. For these reasons, the Board cannot claim unawareness of the country's opioid epidemic and the Company's contribution to that epidemic.

20. The Board knowingly or recklessly disregarded signs demonstrating its wrongdoing, and allowed the Company and its distribution centers to sell controlled substances to retailers without ensuring compliance with federal laws and regulations and its own internal controls.

21.     The Board has made an artificial showing that it takes its role in the opioid crisis seriously by implementing committees and procedures that are meant to appear as if they are preventing diversion. However, in reality, these systems are knowingly ineffective, do not allow for information sharing, and generally ensure the Company can continue to sell copious amounts of opioids without a real safety check.

22.     This litigation on behalf of Cardinal Health seeks to rectify the conduct of the individuals bearing ultimate responsibility for the Company's blatant misconduct – the Board – and to impose appropriate responsibility upon those individuals.

## JURISDICTION AND VENUE

23.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2) in that Plaintiff and Defendants are citizens of different states, and the matter in controversy exceeds $75,000.00, exclusive of interests and costs. This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

24.     Venue is proper in this District because Cardinal Health conducts business and maintains its principal executive offices this District. Upon information and belief, one or more of the Defendants resides in this District. Further, Cardinal Health engages in numerous activities and conducts business here, which had an effect in this District.

## THE PARTIES

25.     Plaintiff is a current stockholder of Cardinal Health, and has continuously held Cardinal Health stock since 2003. Plaintiff is a citizen of New Jersey.

26.     Nominal defendant Cardinal Health is an Ohio corporation with its principal executive offices located at 7000 Cardinal Place, Dublin, Ohio 43017. Cardinal Health is a healthcare services company. Cardinal Health describes itself as a "global, integrated health care

services and products company," and is one of the top three drug distributors in the U.S., with annual revenues of $137 billion in 2018. At all relevant times, Cardinal Health distributed or directed the distribution of pharmaceuticals, including opioids and other controlled substances, to retail pharmacies and institutional providers nationwide. Cardinal Health's common stock is traded on the New York Stock Exchange under the ticker symbol "CAH."

27.     Defendant Colleen F. Arnold ("Arnold") has served as a Cardinal Health director since 2007. Arnold is a member of the Company's Audit Committee. Upon information and belief, Arnold is a citizen of Florida.

28.     Defendant Carrie S. Cox ("Cox") has served as a Cardinal Health director since 2009. Cox is chair of the Company's Human Resources and Compensation Committee and the Ad Hoc Committee. Upon information and belief, Cox is a citizen of Florida.

29.     Defendant Calvin Darden ("Darden") has served as a Cardinal Health director since 2005. Darden is a member of the Company's Human Resources and Compensation Committee and the Ad Hoc Committee the Company created in 2018 in repose to the opioid crisis. Upon information and belief, Darden is a citizen of Georgia.

30.     Defendant Bruce L. Downey ("Downey") has served as a Cardinal Health director since 2009. Downey is a member of the Company's Audit Committee, Nominating and Governance Committee and chair of the Ad Hoc Committee. Upon information and belief, Downey is a citizen of Virginia.

31.     Defendant Patricia A. Hemingway Hall ("Hall") has served as a Cardinal Health director since 2013. Hall is a chair of the Company's Nominating and Governance Committee and a member of the Company's Human Resources and Compensation Committee. Upon information and believe, Hall is a citizen of Texas.

32.     Michael C. Kaufmann ("Kaufmann") was appointed as CEO and a director of Cardinal Health in January 2018. Kaufmann is a 28-year veteran of Cardinal Health, having served in numerous high-ranking executive officer roles at the Company. From 2014 to December 2017, he served as Chief Financial Officer, and from 2009 to 2014, he served as Chief Executive Officer – Pharmaceutical Segment. Prior to that, Kaufmann held a range of other senior leadership roles at Cardinal Health across operations, sales and finance, including in both the Pharmaceutical and Medical segments and closely served under the leadership of former CEO George Barrett. Upon information and believe, Kaufmann is a citizen of Ohio.

33.     Defendant Gregory B. Kenny ("Kenny") has served as a Cardinal Health director since 2007. Kenny is Chairman of the Board and a member of the Company's Nominating and Governance Committee and the Ad Hoc Committee. Upon information and belief, Kenny is a citizen of Ohio.

34.     Nancy Killefer ("Killefer") has served as a Cardinal Health director since 2015. Killefer is a member of the Company's Human Resources and Compensation Committee. Upon information and belief, Killefer is a citizen of Washington DC.

35.     Defendant J. Michael Losh ("Losh") served as a Cardinal Health director from 1996 until he resigned from the Board in August 2009 and later rejoined the Board in 2018. Losh was the Company's Chief Financial Officer ("CFO"), on an interim basis, from July 2004 to May 2005. Losh is chair of the Company's Audit Committee. Upon information and belief, Losh is a citizen of Michigan.

36.     Defendants Arnold, Cox, Darden, Downey, Hall, Johri, Kaufmann, Kenny, Killefer and Losh collectively referred to as "Director Defendants" and together with Akhil Johri ("Johri"), who was elected to the Board in February 2018, the "Board."[1]

37.     Defendants Arnold, Downey, Johri and Losh are collectively referred to as the "Audit Committee Defendants."

38.     Defendant George S. Barrett ("Barrett") served as chairman and chief executive officer of Cardinal Health, Inc. from 2009-2017.  He resigned in 2017 following a proxy contest by the Teamsters seeking his ouster because of his failure to adequately respond to the opioid crisis.  Upon information and believe, Barrett is a citizen of Ohio.

39.     Defendants Arnold, Barrett, Cox, Darden, Downey, Hall, Johri, Kaufmann, Kenny, Killefer and Losh collectively referred to as "Director Defendants."

**DEFENDANTS' DUTIES**

40.     By reason of their positions as officers, directors, and fiduciaries of Cardinal Health and because of their ability to control the business and corporate affairs of Cardinal Health and its subsidiaries, Defendants owed Cardinal Health and its stockholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Cardinal Health in a fair, just, honest, and equitable manner. Defendants were and are required to act in furtherance of the best interests of Cardinal Health and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Cardinal Health

---

[1]     Johri is not named as a defendant at this time because he was not a member of the board at the time of any of the Company's previous actions by and settlements with the DEA and other government agencies.

and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

41.     Cardinal Health's corporate documents (such as the Company's Corporate Governance Guidelines) also expressly detail the Board's duties, including that the Board ensure that the Company operates in a legal and ethically responsible matter.

42.     Cardinal Health maintains, and the directors are obligated to follow, formal Corporate Governance Guidelines.  The Corporate Governance Guidelines are meant to ensure that the Company operates in a legal and ethically responsible manner.  As stated in the Corporate Governance Guidelines:

> The Board serves as the representative and acts on behalf of all of the shareholders of Cardinal Health. In representing Cardinal Health's shareholders, the basic responsibility of the Directors is to exercise their business judgment in good faith and to act in what they reasonably believe to be the best interests of the Company.

43.     Under the Corporate Governance Guidelines, the Board is required to:

> Oversee management's efforts to establish and maintain for the Company high standards of legal and ethical conduct in all of its businesses, including conformity with all applicable laws and regulations.

44.     Under the Company's Corporate Governance Guidelines, the Board has responsibility for overseeing the business and affairs of the Company, including risk management.

45.     The Company maintains Standards of Business Conduct (the "Code of Conduct"), that "outline what is expected of every employee, officer and director of Cardinal Health."

46.     The Code of Conduct outlines the Company's "values" claiming employees, officer and directs "can be trusted to do the right thing."

47.     The Code of Conduct sets the first tenant as "1. Act with integrity and in compliance with the law."  The Code explains that the Company's "reputation as a leading healthcare company depend on each of us making appropriate decisions everyday."

48.     The Board has several committees to monitor specific aspects of Cardinal Health's business.  These committees have their own charters setting forth additional duties for their respective members.  For example, the charter of the Audit Committee provides that its members have a special obligation to monitor the Company's compliance with the law.  The charter states that the Audit Committee must:

> Review quarterly reports from the Chief Legal and Compliance Officer regarding the Company's ethics and compliance program, including matters involving possible significant non-compliance with applicable legal requirements and the Company's Standards of Business Conduct by employees of the Company and its subsidiary/foreign affiliated entities.

> Review periodic reports from the Chief Legal and Compliance Officer regarding the Company's quality and regulatory compliance programs.

> Discuss with the Company's internal counsel legal matters that may have a material impact on the financial statements or the Company's compliance policies and internal controls.

49.     The Board has ultimate responsibility for risk management, and has delegated to the Audit Committee certain responsibilities. The Audit Committee engages in periodic discussions with management concerning the process by which risk assessment and management are undertaken.

50.     Defendants, because of their positions of control and authority as directors and/or officers of Cardinal Health, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Cardinal Health, each of the Defendants had knowledge of the misconduct described herein.

51.     To discharge their duties, the officers and directors of Cardinal Health were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Cardinal Health were required to, among other things:

a.     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

b.     Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

c.     When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

## SUBSTANTIVE ALLEGATIONS

### Background of the Company

52.     Cardinal Health distributes pharmaceuticals, including controlled and non-controlled prescription medications, to all 50 states in the United States.  Cardinal Health is one of three wholesale distributors that account for 90 percent of the entire wholesale drug market.

53.     Cardinal Health's distribution solutions segment is highly competitive in both price and service.  Price, quality of service, innovation and, in some cases, convenience to the customer are generally the principal competitive elements in this segment.

54.     The Company's most recent 10-K filed with the SEC for fiscal year 2018 reported revenue of $138.8 billion, a 5 percent increase from 2017 "due primarily to sales growth from pharmaceutical distribution and specialty pharmaceutical customers."

55.     More recently, the Company announced its third quarter results for fiscal year 2019.  In the third quarter 2019 Cardinal Health's revenues in the Pharmaceutical Segment increased by 6% from $28.7 billion for Q3 in 2018 to $31.4 billion in Q3 of 2019.

***The Opioid Crisis***

56.     The United States is in the grips of the deadliest drug epidemic in its history and Cardinal Health is one of the largest suppliers of the opioid drugs at the center of the epidemic. It is estimated that the prescription opioid epidemic costs the United States more than $78.5 billion annually, according to a study published in the October 2017 issue of Medical Care.

57.     Opioids are drugs (such as morphine, oxycodone, and hydrocodone) formulated to replicate the pain-reducing properties of opium.  For most of the 20th century, doctors reserved opioids for severe, short-term pain, such as surgery, or for pain related to deadly diseases like cancer.  In the 1990s these drugs began to be prescribed for pain related to arthritis or back pain. By 2016, more than 289 million annual prescriptions were written for opioids.

58.     Since OxyContin (the branded name pharmaceutical for oxycodone a opioid narcotic) was introduced in 1996, there have been nearly 218,000 overdose deaths related to prescription opioids, according to the Centers for Disease Control and Prevention ("CDC"). Between 2000 and 2015, the rate of opioid overdose deaths in the United States more than tripled.

59.     During 2017, there were more than 72,000 overdose deaths in the United States, including 49,068 that involved an opioid, according to a provisional CDC count.  More than 130

people died every day from opioid-related drug overdoses in 2016 and 2017, according to the US Department of Health & Human Services.

60.     *The New York Times* reported that "[p]ublic health officials have called the current opioid epidemic the worst drug crisis in American history, killing more than 33,000 people in 2015. Overdose deaths were nearly equal to the number of deaths from car crashes. In 2015, for the first time, deaths from heroin alone surpassed gun homicides."

61.     Between 2007 and 2016, the most widely prescribed opioid was hydrocodone, commonly known as Vicodin. In 2016, 6.2 billion hydrocodone pills were distributed nationwide. The second most prevalent opioid was oxycodone, commonly known as Percocet. In 2016, 5 billion oxycodone tablets were distributed in the United States.

62.     The International Narcotics Control Board reported that in 2015, Americans represented about 99.7% of the world's hydrocodone consumption.

63.     Distributors of opioids, such as Cardinal Health, have played a large role in the proliferation of the opioid crisis by failing to stop suspicious orders in compliance with the CSA and other laws thereby allowing opioids to be dispensed to individuals that abuse them or sell them to others to be abused.

64.     In a *60 Minutes* interview in October 2017, former DEA agent Joe Rannazzisi described Cardinal Health's industry as "out of control," stating that "[w]hat they wanna do, is do what they wanna do, and not worry about what the law is. And if they don't follow the law in drug supply, people die. That's just it. People die." He further explained that:

> JOE RANNAZZISI: The three largest distributors are Cardinal Health, McKesson, and AmerisourceBergen. They control probably 85 or 90 percent of the drugs going downstream.

[INTERVIEWER]: You know the implication of what you're saying, that these big companies knew that they were pumping drugs into American communities that were killing people.

JOE RANNAZZISI: That's not an implication, that's a fact.  That's exactly what they did.

65.     Jim Deldhof, a 40-year DEA veteran said that the distributors such as Cardinal Health never made the effort to "do the right thing.  And there was no good faith effort.  Greed always trumped compliance.  It did every time."  He further explained that "I can tell you with 100 percent accuracy that we were in there on multiple occasions trying to get them to change their behavior.  And they just flat out ignored us."

66.     Furthermore, in an effort to stave off investigations from the DEA, the pharmaceutical industry simply lured the investigators away from government jobs with offers of new jobs with big salaries.  CBS news reported "Since the crackdown on the distributors began, the pharmaceutical industry and law firms that represent them have hired at least 46 investigators, attorneys and supervisors from the DEA, including 32 directly from the division that regulates the drug industry."

***Cardinal Health's Role in the Distribution of Opioids***

67.     Pharmaceutical manufacturers do not sell drugs directly to patients or pharmacies. Instead, manufacturers sell their products to pharmaceutical wholesalers, which, in turn, sell drugs to pharmacies, which, in turn, provide the drugs to patients.  The diagram below is taken from a June 2017 publication by the University of Southern California's Leonard D. Schaeffer Center for Health Policy & Economics and shows the overall structure of the market for non-specialty drugs covered under private insurance and purchased in a retail setting:



68.  The table below, taken from the same study, identifies the key players and their market share as of 2015:

| MANUFACTURERS | | | |
|---|---|---|---|
| | **US MARKET SHARE** | | |
| Company | All[c] | Brands[d] | Generics[e] |
| Gilead Sciences (Brand) | 6.9% | 10.9% | -- |
| J&J (Brand) | 5.9% | 9.4% | -- |
| Roche (Brand) | 5.7% | 9.0% | -- |
| Merck & Co (Brand) | 5.7% | 9.0% | -- |
| Amgen (Brand) | 5.3% | 8.5% | -- |
| Pfizer (Brand) | 4.7% | 7.4% | -- |
| Fresenius Kabi (Generic) | 4.6% | -- | 3.1% |
| AbbVie (Brand) | 4.4% | 6.9% | -- |
| Sanofi (Brand) | 4.3% | 6.8% | -- |
| Novartis (Brand) | 3.3% | 5.3% | -- |
| Astrazeneca (Brand) | 3.1% | 4.8% | -- |
| Allergan (Brand) | 3.0% | 4.7% | -- |
| GlaxoSmith Kline (Brand) | 2.6% | 4.2% | -- |
| Pfizer-Hospira (Generic) | 2.3% | -- | 3.6% |
| Teva (Brand) | 2.1% | 3.3% | -- |
| Mylan (Generic) | 1.6% | -- | 8.8% |
| Teva (Generic) | 1.5% | -- | 12.2% |
| Novartis-Sandoz (Generic) | 1.1% | -- | 11.5% |
| Allergan-Actavis (Generic) | 1.1% | -- | 8.9% |
| Aspen (Generic) | 0.4% | -- | 4.1% |
| Lupin (Generic) | 0.3% | -- | 2.7% |
| **TOTAL** | 70% | 90% | 55% |

| PHARMACY BENEFIT MANAGERS | |
|---|---|
| Company | Share[h] |
| Express Scripts | 29% |
| CVS Health | 24% |
| Optum Rx | 13% |
| **TOTAL** | **66%** |

| WHOLESALERS | |
|---|---|
| Company | Share[e] |
| McKesson | 32.7% |
| AmerisourceBergen | 31.6% |
| Cardinal Health | 20.7% |
| **TOTAL** | **85%** |

| PHARMACIES | |
|---|---|
| Company | Share[12] |
| Walgreens | 14.9% |
| CVS Retail | 13.8% |
| Express Scripts Mail Order Pharmacy | 11.0% |
| CVS Mail Order | 9.0% |
| Walmart | 5.5% |
| **TOTAL** | **54%** |

| INSURERS[g] | |
|---|---|
| Company | Share[b] |
| UnitedHealth Group | 11.4% |
| Anthem | 9.2% |
| Aetna | 4.1% |
| Cigna | 4.5% |
| Humana | 8.7% |
| Centene | 3.4% |
| HealthNet | 2.6% |
| WellCare | 2.1% |
| Molina | 2.0% |
| Magellan | 0.5% |
| **TOTAL** | **49%** |

69.     At all relevant times, and as demonstrated above, the wholesale pharmaceutical segment of the market has been dominated by a group of three companies known as the "Big Three": Cardinal Health, AmerisourceBergen and McKesson.

70.     Cardinal Health and its competitors utilize a delivery method to pharmacies called "just-in-time" delivery. This means that most pharmacies obtain drug deliveries every day, sometime multiple times a day, to allow the pharmacy to hold as little inventory as possible.

71.     Because these deliveries are made on such a frequent basis, distributors know exactly how many opioid prescripts and individual pills they are delivering to each pharmacy.

72.     Because distributors, including Cardinal Health, are the closest link to pharmacies, they are the uniquely situated to determine if a pharmacy is suspected of facilitating the diversion of prescription opioid pills.

73.     The Healthcare Distribution Alliance ("HDA") (formerly known as Healthcare Distribution Management Association), a trade association of pharmaceutical distributors to which Cardinal Health belongs, has long taken the position that distributors such as Cardinal have a responsibility to "prevent diversion of controlled prescription drugs" not only because they have statutory and regulatory obligations do so, but "as responsible members of society." The HDA recognizes that Cardinal Health and the other distributors "are uniquely situated to perform due diligence in order to help support the security of the controlled substances they deliver to their customers" because they are at "the center of a sophisticated supply chain."

74.     Cardinal Health's distribution centers are registered with the DEA, which means those distribution centers are required to operate in accordance with the CSA.

75.     The DEA is the agency primarily responsible for administering the CSA and the regulations promulgated thereunder, and is responsible for investigating CSA violations.

76.     The regulations promulgated under the CSA include a requirement to design and operate a system to detect and report "suspicious orders" for controlled substances that deviate from the normal course and are suspected of being diverted into illicit markets. *See* 21 C.F.R. § 1301.74(b).

77.     The CSA seeks to prevent the diversion of controlled substances by establishing a closed system of distribution. As a distributor in that closed system, Cardinal Health is required by the CSA to register with DEA to engage in the commercial distribution of certain controlled substances for therapeutic use. 21 U.S.C. § 823(b), (e); 28 C.F.R. § 0.100.

78.     Rather than comply with the CSA, Cardinal Health sought to avoid the DEA's enforcement. Joe Rannazzisi told *60 Minutes* that the attorneys at Cardinal Health went over his head and called his bosses at the Justice Department. He also said that the drug industry used their money and influence to pressure top lawyers at the DEA to take a softer approach.

79.     The Company was incentivized to ship more opioids to their customers not only because more sales meant more profits, but also because acquiring larger numbers of opioids from wholesalers results in a lower per pill cost and a higher profit margin. The Board's decided to put profits over the lives of countless Americans and the long-term reputation of the Company.

80.     Cardinal Health's directors and executives knew that Cardinal Health was required to comply with the CSA and other regulations.

81.     At all relevant times, the Directors and Officers Defendants were aware that the Company operated in a highly regulated environment. The Company's Form 10-K for fiscal year 2011 warned:

Our business is highly regulated in the United States at both the federal and state level and in foreign countries. Depending upon their specific business, our subsidiaries may be subject to regulation by government entities including:

- the United States Food and Drug Administration (the "FDA")
- the United States Drug Enforcement Administration (the "DEA"),
- the United States Nuclear Regulatory Commission (the "NRC"),
- the United States Department of Health and Human Services ("HHS"),
- United States Customs and Border Protection,
- state boards of pharmacy,
- state controlled substance agencies,
- state health departments, insurance departments or other comparable state agencies, and
- foreign agencies that are comparable to those listed above.

These regulatory agencies have a variety of civil, administrative and criminal sanctions at their disposal. They can require us to suspend distribution of products and controlled substances or initiate product recalls; they can seize products or impose significant criminal, civil and administrative sanctions; and they can seek injunctions to halt the manufacture and distribution of products.

Distribution. The FDA, DEA and various state authorities regulate the marketing, purchase, storage and distribution of pharmaceutical and medical products and controlled substances under various state and federal statutes including the Prescription Drug Marketing Act of 1987. Wholesale distributors of controlled substances must hold valid DEA registrations and state-level licenses, meet various security and operating standards, and comply with the Federal Controlled Substances Act governing the sale, marketing, packaging, storage and distribution of controlled substances.

Similar language appears in each Form 10-K that Cardinal Health has filed since and each 10-K is signed by every member of the Board.

82. Furthermore, Cardinal Health has acknowledged its responsibility to comply with the law and stem the proliferation of opioids. For example, Cardinal Health claims that: "We challenge ourselves to best utilize our assets, expertise and influence to make our communities stronger and our world more sustainable, while governing our activities as a good corporate citizen in compliance with all regulatory requirements and with a belief that doing 'the right thing' serves everyone."

22

83. Cardinal Health also claims to be an industry leader "in anti-diversion strategies to help prevent opioids from being diverted for misuse or abuse" by "maintain[ing] a sophisticated, state-of-the-art program to identify, block and report to regulators those orders of prescription controlled medications that do not meet [its] strict criteria."

84. Cardinal Health touts its funding for "Generation Rx," which funds grants related to prescription drug misuse

85. These assurances of the Company's compliance with its legal obligations, demonstrate that the Board knew their obligations under the law and claimed they were in compliance with those obligations when in fact they were not.

### Cardinal Health Has a History of Evading the Law, Being Caught, and Settling with the DEA

86. For nearly a decade, Defendants caused and permitted Cardinal Health to openly violate and evade federal laws and regulations pertaining to its products and permitted excessive sales of controlled substances without reporting the suspicious nature of the sales to the DEA.

87. Defendants' bad acts were eventually noticed by the DEA. And the Board was made aware of these bad acts yet chose to pay penalties and make no real changes to resolve the problems. These "red flags" put the Board on ample notice that the Company was engaging in illegal conduct.

### Red Flag #1

88. As early as 2007 the Board was aware that the Company had failed to properly address the distribution of opioids to its pharmaceutical customers. At least five members (Arnold, Darden, Kaufmann, Kenny, and Losh) of the current ten-person Board were either Board members or executive leadership positions at the time of the 2008 DEA Settlement.

89. The DEA issued three ISOs in 2007 in connection with three facilities that had been distributing high amounts of opioids.

90. On November 28, 2007, the DEA issued an ISO to Cardinal Health in connection with its distribution center in Auburn, Washington (the "Auburn Facility"), immediately suspending the facility's Certificate of Registration because its continued registration constituted "an imminent danger to public health and safety."

91. On December 5, 2007, the DEA issued an ISO to Cardinal Health regarding its drug distribution facility located in Lakeland, Florida (the "Lakeland Facility"), immediately suspending the facility's Certificate of Registration because its "continued registration constitute[d] an imminent danger to public health and safety."

92. On December 7, 2007, the DEA issued an ISO to Cardinal Health because, from January 2005 to August 2007, its distribution center in Swedesboro, New Jersey (the "Swedesboro Facility"), "distributed over 4.5 million dosage units of combination hydrocodone products to customers that it knew or should have known were diverting hydrocodone into other than legitimate medical, scientific and industrial channels."

93. In January 2008, the Company issued standard operating procedures ("SOPs") to allegedly evaluate retail customers for risks of diversion. The SOPs were revised in December 2008 to outline specific steps that employees should monitor.

94. Then on January 30, 2008, the DEA issued an Order to Show Cause as to why the DEA should not revoke the Certificate of Registration assigned to the Company's distribution center in Stafford, Texas (the "Stafford Facility").

95.     The Board met on January 31, 2008.  The Board was told that the Company was taking swift action in response to a "flurry of actions from the DEA."[2]  The Board received "a seven-page chart listing the tasks to be completed, the progress thus far, and target completion dates."

96.     The Board was provided with updates on the progress of the anti-diversion program in February 2008, and at the May 7, 2008 Board meeting.

97.     The anti-diversion plan, however, was flawed.  It did not allow for information sharing to storage, meaning that one Cardinal Health employee could learn a prescriber was not legitimate and therefore flag pharmacies that worked with that prescriber, but other employees overseeing different pharmacies would have no way to know this information.

98.     The Board was content to simply let management create a flawed "compliance program" rather than asking tough questions and requiring real results.

99.     The Board was also informed in May 2008 that the Ohio Board of Pharmacy opened an investigation based on "allegations that the Company's distribution center in Findlay, Ohio made suspicious sales to a pharmacy in Dublin from December 2006 through March 2007."

100.    On August 5, 2008 the Audit Committee met.  In advance of their meeting the Company's Chief Compliance Officer Report, Craig Morford, provided a report to the committee regarding the implementation of the Company's new anti-diversion procedures.  Morford also provided a report to the full Board in August 2008.

---

[2]     As described below the Company created a Special Committee to consider stockholder litigation demands.  That Committee issued three reports.  These facts were outlined in the Special Committee reports as published on the Company's website.

101.    The Company entered into the 2008 DEA Settlement in September 2008, wherein it agreed to "maintain a compliance program designed to detect and prevent diversion of controlled substances as required under the CSA and applicable DEA regulations." Cardinal Health also agreed to pay a civil fine of $34 million, which, at the time, was the largest fine in United States history associated with a DEA registration suspension. In fact, prior to this settlement the largest monetary penalty paid for a violation of the CSA was $13.25 million paid by McKesson in April 2008.

102.    The majority of the fine was attributed to conduct at the Lakeland Facility ($16 million). The remainder was apportioned among six other districts.

103.    The Audit Committee was provided with updates in November 2008 and February 2009.

***Red Flag #2***

104.    In April 2009, SOPs were issued requiring review of the top-twenty-five retail independent purchasers of commonly diverted drugs, to identify customers of concern and visit such customers.

105.    In advance of their May 2009 meeting, the Audit Committee was provided with another update. During that update the Committee was informed that "on March 16, 2009, the DEA notified the Company that it considered one of those distribution centers, the facility located in Valencia, California, to be "unsatisfactory," and that the Company met with the DEA to address those concerns on March 19 and submitted a written response to the DEA on March 25."

106.    In June 2009, the SOPs were revised to redefine how to identify high and medium risk customers.

107.    The Audit Committee and the full Board received another update from Morford in August 2009.

108.    The SOPs were revised again in 2010.

109.    In October 2010, "Morford provided the Audit Committee with an Annual Quality and Regulatory Report, which included an overview of the then-current regulatory environment. Morford noted that the DEA had increased its focus in 'high risk' states, including Florida."

110.    The full Board met in November 2010 and obtained a review of the Company's anti-diversion efforts from Morford.

111.    On July 7, 2011, DEA representatives met with Cardinal Health representatives at DEA headquarters. During that meeting the DEA discussed actions to address theft and loss reporting and due diligence procedures to control against diversion with respect the Company's Auburn, Washington facility. The DEA also advised Cardinal Health at this meeting that it needed to examine its Florida customers, including its retail chain customers.

112.    On July 26, 2011, Morford sent a memo to the full Board outlining the Company's key initiatives and accomplishments in fiscal year 2011. Interestingly the memo focused on the Company's ability to eliminate "false positives." The memo notes the number of "legitimate customers or orders flagged as suspicious" had decreased. Meaning, the Company was most concerned with making sure it could sell to as many customers as possible and minimize any reports of red flags.

113.    The full Board was provided with an updated report in advance of the November 2011 board meeting on the status of the Company's anti-diversion efforts. The update also stated that the Company had reduced "the incidence of flagged events was reduced by 2,509, or 37%,

from fiscal year 2010 to 2011;" again demonstrating the Company's focus on selling to as many customers as possible rather than strictly ensuring these pills did not get into the wrong hands.

114. The update also informed the Board that "the DEA conducted twelve routine cyclical inspections during fiscal years 2011 and 2012, which resulted in four "observations," or negative findings." The Board therefore knew that over 30% of the inspections were negative.

115. While this was based on a small sample, it should have demonstrated the programs that had been implemented were not working and as fiduciaries to the Company the Board should have required action be taken to resolve the Company's failures to comply with federal law and regulations and its ultimate contribution to the opioid crisis. Instead, the Board was content to idly listen to report after report and turn a blind eye to the problems in the system – problems that were leading to the death of thousands of Americans.

*Red Flag #3*

116. On September 16, 2011, Mallinckrodt LLC, a manufacturer that sells oxycodone to Cardinal Health for distribution, sent a letter to Cardinal Health alerting them to a list of pharmacies that they should consider making on-site visits to evaluate suspicious orders.

117. Mallinckrodt met with Cardinal Health on September 30, 2011 to discuss Cardinal Health's distribution of Mallinckrodt's products in Florida. During that meeting Mallinckrodt stated that Cardinal needed to provide proof that it conducted visits to 40 facilities suspected of suspicious orders within 60 days.

*Red Flag #4*

118. On October 18, 2011, the DEA executed Administrative Inspection Warrants ("AIW") at Cardinal Health Lakeland Facility's top for retail pharmacy Florida customers of oxycodone.

119. On October 26, 2011 the DEA executed a AIW at the Lakeland Facility. On November 8, 2011, the DEA issued an administrative subpoena on Cardinal Health for information on its sales of oxycodone and its compliance procedures.

120. As a result of the AIW and the administrative subpoena, the DEA determined there was "a persistent failure to exercise due diligence to ensure that controlled substances were not being diverted. DEA concluded that over a period of approximately 3 years, November 2008 to December 2011, Cardinal's anti-diversion controls were inadequate to meet their due diligence responsibilities."[3]

121. The DEA's conclusions were based on:

(i) exceedingly large increasing volume of shipments of oxycodone to its largest Florida retail customers, which volumes were supported by inadequate documentation; (ii) a low number of suspicious orders reported; (iii) a low number of on-site visits to these top retailers and no site visits to retail chain pharmacy customers; and (iv) evidence that Cardinal's due diligence practices were inconsistent with both 2008 MOA and Cardinal's own policies the purpose of which was to reduce diversion.

*Red Flag #5*

122. On February 2, 2012, the DEA issued a second ISO regarding the Lakeland Facility that specifically noted "[d]espite the MOA, the specific guidance provided to Cardinal by DEA, and despite the public information readily available regarding the oxycodone epidemic in Florida, Cardinal has failed to maintain effective controls against the diversion of controlled substances into other than legitimate medical, scientific, and industrial channels, in violation of 21 U.S.C. §§ 823(b)(1) and (e)(1)."

---

[3] Declaration of Joseph Rannazzisi, a Deputy Assistant Administrator for the DEA's Office of Diversion Control ("Rannazzisi Decl.") submitted in connection with Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction (the "Opposition Brief") filed in *Cardinal Health, Inc. v. Holder*, Case No. 1:12-cv-00185 (D.D.C.).

123.    The ISO alleged that from January 2008 through December 2011 the Company sold excessive amounts of oxycodone to its top four retail pharmacy customers serviced by the Lakeland Facility (the same facility that was the subject of the 2008 DEA Settlement): two CVS stores, CVS/Pharmacy #00219 ("CVS 219") and CVS/Pharmacy #05195 ("CVS 5195"), and two independent retail pharmacies, Caremed Health Corporation ("Caremed") and Gulf Coast Pharmacy ("Gulf Coast").

124.    The DEA noted that Cardinal Health supplied more than 12 million dosage units through the Lakeland Facility to only four area pharmacies, nearly fifty times as much oxycodone as it shipped to the rest of Florida and an increase of 241% in two years, and from the same facility that the Board was already fully aware was a problem.  The DEA found that Cardinal Health's internal investigator warned Cardinal against selling opioids to these pharmacies but Cardinal Health failed to notify the DEA or cut off its supply, instead it increased shipments to these pharmacies.

125.    The volume of shipments to these Florida facilities is staggering.  During 2011 the Lakeland Facility distributed over 3.1 million tablets of oxycodone to 6 pharmacies in Sanford, Florida, which has a population of 53,570.  The Lakeland Facility specifically supplied 3 million of these tablets (96% of the Sanford distributions) to CVS219 and CVS 5195.

126.    Within a mile of CVS219 (which received 1.8 million tablets of oxycodone form Cardinal Health in 2011) is a Walgreens, a retail chain competitor of CVS.  During 2011, this Walgreens purchased 176,500 tablets of oxycodone.

127.    The DEA determined that "from April 2009 to August 2011, Cardinal disregarded the oxycodone thresholds for its top four retailers at least 44 times . . . sometimes by tens of

thousands. This unexplained disregard for its own thresholds suggests that Cardinal did not take its own policies seriously." Rannazzisi Decl.

128. The DEA also found that Cardinal Health inexplicably continuously approved increased thresholds for oxycodone sales.

129. Between November 25, 2009 and November 24, 2010, for CVS219 Cardinal Health "adjusted the threshold for oxycodone sales five times, allowing CVS[219]'s monthly allowance of dosage units to increase from 112,000 per month to 319,000 per month."

130. And "[b]etween August 11, 2010 and November 24, 2010, Cardinal adjusted the threshold for oxycodone sales four times, allowing CVS[5195]'s monthly allowance of dosage units to increase from 27,000 to 177,700." *Id.*

131. In addition, "[d]espite the high volume of oxycodone and exponentially increasing sales, Cardinal investigators never visited CVS219 [nor did they] . . . conduct[] an official site visit of CVS5195. . . The only visit that Cardinal made to CVS5185 was to take a picture of the exterior on a Sunday afternoon." Carter Decl.

132. On average 50% of the sales at these two CVS locations were in cash, a major red flag for potential diversion. *Id.*

133. The DEA also found that the volume of oxycodone distributed to the Gulf Coast pharmacy exponentially exceeded sales to other pharmaceuticals. "Between January 1, 2008 and September 30, 2011, Cardinal sold Gulf Coast Pharmacy, its second largest customer, approximately 3.4 million dosage units of oxycodone, for an average of 96,644 units per month during this time period." Carter Decl. The annual increases of oxycodone at Gulf Coast were excessive: between 2008 and 2009 the monthly oxycodone distribution increased by 549% from 32,820 to 213,100; between 2009 and 2010 the monthly oxycodone distribution increased by

404% from 213,100 to 1,073,540; and in 2011 Gulf Coast purchased over 2,063,100 dosage units. *Id*.

134.    "Between April 13, 2009 and May 29, 2010, Cardinal adjusted the threshold for oxycodone sales [to Gulf Coast] eleven (11) times." Carter Decl.

135.    The sales to Caremed were similarly suspicious. "Between January 1, 2008 and September 30, 2011, Cardinal sold Caremed. . .approximately 2.1 million dosage units of oxycodone, for an average of approximately 59,264 dosage units per month during this time period." Carter Decl. As of September 21, 2011, 40% of those sales were paid in cash. *Id*.

136.    Cardinal Health similarly continued to raise its threshold – 9 times between April 14, 2010 and May 26, 2011 – rather than cut off these suspicious sales. Carter Decl. The net increase was by 609% from 26,000 dosage units to 158,300 dosage units. *Id*.

137.    The Company's decision to increase its thresholds as a way to avoid reporting suspicious purchases to the DEA evidences that the "compliance program" Cardinal Health put in place was flawed. The Board, having responsibility to oversee compliance with the 2008 DEA Settlement and the CSA, knew or should have known that the Company's employees were changing the thresholds to ensure sales could rise while trying to skirt their obligation under the law. The Board ignored its duty to ensure the program put in place was effective.

138.    Between the 2008 DEA Settlement and the 2012 ISO, the DEA conducted 19 scheduled investigations that resulted in two letters of Admonition, two additional investigations for failure to report suspicious orders and one investigation for shipping to a registrant other than the one that ordered the controlled substances. As a result, the 2012 ISO should have come as no surprise to the Board.

139.    Rather than address these identified deficiencies, the Company initiated legal action.  The day after the 2012 ISO was issued, February 3, 2012, Cardinal Health filed a lawsuit against the DEA, then-Attorney General Eric Holder, then-DEA Administrator Michele M. Leonhart and the Department of Justice seeking to restrain the DEA from taking action against the Company.  A lawsuit against such high-ranking government officials would likely have required Board authorization.

140.    While a Temporary Restraining Order was ordered by the court that same day, it was short lived.  The Company moved for a preliminary injunction on February 6, 2012, which was successfully opposed by the government.  On February 29, 2012, the court denied Cardinal Health's motion for preliminary injunction and dissolved the temporary restraining order it had entered on February 3, 2012.

141.    The Company revised its SOPs in April 2012 and June 2012.  However, there is no evidence that the Board sought to ensure these revisions would allow for information sharing and storage, or that they questioned how the program would actually ensure opioids were not distributed to the wrong people.  Rather, as revues increased they were again content to keep their head in the sand.

142.    The Board knew that prior to the 2012 ISO Cardinal Health was "operating under the [incorrect] impression that if the Company performed its diligence on customers, it could rely on the pharmacist's expertise and judgment in analyzing customers and orders."  Therefore, the Company was not looking at large volume orders as being suspicious.

143.    The Board knew that relying on a pharmacists' expertise was impermissible under the law.  On September 27, 2006 the DEA sent a letter to Cardinal Health's Lakeland Facility cautioning "a distributor may not simply rely on the fact that the person placing the suspicious

order is a DEA registrant and turn a blind eye to the suspicious circumstances. [Rather] the distributor . . . [must] exercise due care in confirming the legitimacy of all orders prior to filing." These cautionary statements were simply ignored.

144.    On February 21, 2012, *The Wall Street Journal* reported that "[t]he federal government alleges Cardinal Health Inc. and CVS Caremark Corp. were aware of high-volume orders of prescription painkiller oxycodone shipped to two pharmacies in Florida, in a closely watched case probing how much responsibility companies bear for a growing drug-abuse problem."  The story went on to explain that "[t]he DEA moved earlier this month to revoke controlled-medication licenses at one Cardinal distribution facility and four pharmacies – including two Sanford, Fla., stores owned by drugstore chain CVS.  Two other, independent pharmacies in Sanford that came under scrutiny in the same case voluntarily surrendered their controlled-substance licenses."  They then explained that "[t]he case involving Cardinal and CVS is the latest example of the DEA's strategy of targeting large corporations in its efforts to tame the nation's prescription drug-abuse problem."

145.    On May 15, 2012, Cardinal Health entered into the 2012 DEA Administrative Settlement wherein Cardinal Health again agreed to improve its anti-diversion procedures. In connection with the 2012 DEA Administrative Settlement the Company admitted it had failed to maintain internal controls, detect and report suspicious activity and had failed to adhere to the provisions set forth in the 2008 DEA Settlement.

***Red Flag #6***

146.    In 2012, the West Virginal attorney general sued Cardinal Health for negligently and recklessly distributing more than 241 million prescription opioids over a six-year period to a state with a population of 1.8 million people.  Notably, the West Virginia suit alleged that

Cardinal Health distributed more than 309,000 prescription opioid doses to a town in West Virginia that had a population of just 211 people – this amounts to 1,464 doses per person (including children).

147.    In 2012, the Board included four members who were on the Board or high-ranking executive officers at the time of the failures that led to the 2008 DEA Settlement, and who were well aware of the Company's obligations under that Settlement Agreement.

148.    In January 2017, the Company settled the West Virginia lawsuit for $20 million, the largest pharmaceutical settlement in West Virginia's history (the "West Virginia Settlement").

*Red Flag #7*

149.    In December 2016, Cardinal Health entered into a monetary settlement with the DEA in connection with the 2012 claims that Cardinal Health breached its prior settlement agreements (the "2016 DEA Monetary Settlement").  Specifically, the DEA charged Cardinal Health with failing to report suspicious orders across Washington, Maryland, New York and Florida (including the Lakeland Facility).  The DEA alleged that Cardinal Health's own investigator warned Cardinal Health against selling opioids to a particular pharmacy in Wisconsin that was suspected of opioid diversion but Cardinal Health did nothing to notify the DEA or cut off the supply of drugs to the suspect pharmacy. Instead, Cardinal Health increased opioid shipments to the pharmacy to almost 2,000,000 doses of oxycodone in one year, while other comparable pharmacies were receiving approximately 69,000 doses per year.

150.    In the settlement agreement, Cardinal Health again admitted, accepted and acknowledged that it had violated the Controlled Substances Act between January 1, 2009 and May 14, 2012 by failing to: (a) "timely identify suspicious orders of controlled substances and

inform the DEA of those orders, as required by 21 C.F.R. §1301.74(b)"; (b) "maintain effective controls against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels, as required by 21 C.F.R. §1301.74, including the failure to make records and reports required by the CSA or DEA's regulations for which a penalty may be imposed under 21 U.S.C. §842(a)(5)"; and (c) "execute, fill, cancel, correct, file with the DEA, and otherwise handle DEA Form 222 order forms and their electronic equivalent for Schedule II controlled substances, as required by 21 U.S.C. §828 and 21 C.F.R. Part 1305."

151.    Cardinal Health paid $44 million to settle the 2016 DEA Monetary Settlement.

***The Board Failed to Take Meaningful Action Despite these Red Flags***

152.    The current ten-member Board includes: five Board members (Arnold, Darden, Kaufmann, Kenny and Losh) who were on the Board or served in executive leadership positions at the time of the 2008 DEA Settlement; six Board members (Arnold, Cox, Darden, Downey, Kenny, and Kaufmann) who were on the Board or were in executive leadership positions at the time of the 2012 DEA Settlement; and eight Board members (Arnold, Cox, Darden, Doeney, Hall, Kenny, Kaufmann, and Killefer) who were on the Board or were in executive leadership positions at the time of the 2016 DEA Monetary Settlement and the 2017 West Virginia Settlement.

153.    Because a majority of the Board are "repeat offenders" there can be no question that the Current Board is well aware of the Company's repeat history of failing to comply with the CSA and its failure to comply with the terms of the 2008 DEA Settlement Agreement which has led to its current liability.

154.    It is evident that the Director Defendants enabled and created an environment in which Cardinal Health continued to place profit over public safety. Despite all of Cardinal

Health's misrepresentations and misstatements that it has changed its internal controls to address the opioid crisis and prevent diversion and reporting of opioids, the DEA determined that Cardinal Health has not improved its controls and has not shifted its focus to placing safety of consumers and the people of the United States above its own short-term profit.  Instead, the Board allowed Cardinal Health to repeat violations of the CSA, breach Cardinal Health's 2008 Settlement Agreement with the DEA and ignore its own internal policies for reporting and distributing dangerous pharmaceuticals.

155.    The Board's failure to address the CSA violations has resulted in numerous lawsuits that will cause the Company significant harm, including: (i) significant legal fees relating to civil litigation, congressional investigations, as well as dealing with regulatory investigation; (ii) increased compliance costs related to establishing required internal controls and corporate governance; (iii) compensation paid or that will be paid to States, cities and counties, for the harm inflicted upon them by Defendants' misconduct; (iv) substantial regulatory fines; and (v) reputational harm.

156.    As such, Plaintiff was left with no choice but to bring this derivative action, on behalf of Cardinal Health to remedy the Defendants' misconduct and to place the Company's long-term success ahead of short-term and myopic profiteering.  Unless this Court acts to change the culture of Cardinal Health, more senseless deaths will continue to cause substantial financial and reputational harm to Cardinal Health.

### *The Board Continuously Seeks to Duck Its Responsibility to the Company*

157.    In 2012, the Board established a Special Committee to review allegations in connection with a stockholder demand.  The Special Committee was composed of just two members, Clayton M. Jones and David P. King, two former directors who joined the Cardinal

Health Board in 2012 and 2011 respectively and both chose not to stand for re-election in 2018. The Special Committee determined that the Company had robust systems in place and no action was needed. However, the Company continued to find itself in violation of state and federal laws.

158. The Special Committee issued an Investigation Report in April 2013 (the "April 2013 Report") and then generated Supplemental Reports in February 2014 (the February 2014 Report") and October 2014 (the "October 2014 Report").

159. The April 2013 report stated that the Special Committee had interviewed only two Board Members, John Finn (who chose not to stand for re-election in 2014) and Glenn Britt (who died in June 2014).

160. Notably, the Special Committee found that "the Board was fully informed of the implementation of the anti-diversion measures, and received regular and detailed progress reports along the way." It also found that the "Company set a strong tone that anti-diversion was the responsibility of every employee." However, it appears the Audit Committee was only updated quarterly and the full Board updated less frequently about this issue of crucial importance to the Company (and the nation). The Board cannot now claim ignorance to the numerous acts that have occurred following the Special Committee's reports simply because it chose to get infrequent reports when it knew it had a stated duty to be fully informed about anti-diversion procedures.

161. The April 2013 Report dedicated 5-pages to explaining the Board's oversight and knowledge of the Company's handling of the opioid distribution to pharmacies. Specifically, the Special Committee stated that the "Board and Audit Committee received regular and extensive updates regarding the anti-diversion system. . . The Board was also provided with updates as part

of the Company's Enterprise Risk Management system, which informs the Board about risks the Company is facing, including enforcement actions and compliance issues."

162.    Interestingly, the April 2013 Report makes no mention whatsoever of the suit filed by the West Virginia attorney general in 2012.

163.    Unsurprisingly, the April 2013 Report found that the Company should not bring litigation against current and former Board member for breach of fiduciary duty. The Board adopted the recommendations of the April 2013 Report in May 2013.

164.    In September 2013, the Special Committee reconvened to address a second stockholder demand made on the Board. The Special Committee issued the February 2014 Report in response to this demand.

165.    The second stockholder demand sought in part that the Company investigate what information was provided to the Board in connection with a December 2006 Settlement reached with the New York attorney general. The February 2014 Report the Special Committee concluded that "Board was informed of the terms of the settlement, as set forth in an Assurance of Discontinuance (the 'AOD'), and received regular updates on the policies and procedures that were required under the AOD. Indeed, the AOD required the Company to report to the Audit Committee semi-annually and in writing regarding the Company's compliance with the AOD." The Special Committee concluded that because the statute of limitations would have run on this and the NY attorney general had not issued any violations of the AOD there was no reason to investigate this further.

166.    In addition, the second stockholder demand requested the Board investigate the allegations in the 2012 West Virginia lawsuit. According to the February 2014 Report the Board met on June 27, 2012 wherein it was informed of the West Virginia lawsuit that alleged that "the

Company failed to prevent the diversion of controlled substances and to properly report suspicious orders to the West Virginia Board of Pharmacy." The Special Committee concluded that those allegations relied on allegations in the 2012 DEA ISO and therefore there was no basis to investigate this matter further.

167. In connection with its investigation of the second stockholder demand, the Special Committee relied on its counsel to conduct an investigation of document and interview of Board members including Dick Notebaert (who retired from the Board in 2015), Kenny, and Downey.

168. The Special Committee concluded that the Company should not initiate litigation against the Board in January 2014 and the Board adopted the Special Committee's recommendation in February 2014.

169. In May 2014, the Board received a third stockholder demand. The Special Committee reconvened to investigate this demand. The Special Committee issued a supplemental report in October 2014 that again concluded that the Company should not pursue litigation against the Board. The Special Committee found that the third stockholder demand was "nearly identical" to the second stockholder demand "and relies on the exact same allegations and issues asserted in that demand, and [the third stockholder] is represented by the same counsel as [the second stockholder]."

170. The October 2014 Report confirmed that "[s]ince the filing of the West Virginia Action in 2012, the Board and Audit Committee continue to receive regular updates on the status of the lawsuit." The Special Committee found that in connection with the West Virginia Action:

> [t]he allegations contained in the original and amended complaints were the subject of the Committee's previous investigations and the Original and Supplemental Reports, and the conclusions of those reports apply with equal force to the original and amended complaints. Because the West Virginia Action is still pending, the implications of its outcome for the Company are still unknown. However, as with the open issue of possible civil payments by the Company to

the federal authorities, further allegations made in or the ultimate resolution of the West Virginia Action would not change the Committee's conclusions. The Committee's prior demand investigations have thoroughly probed the directors' knowledge and conduct regarding the Company's distribution of controlled substances in general, not excluding the Company's activities in West Virginia. The Committee's determination that there is no sound basis for finding liability on the part of the Director Defendants is independent of and would not be influenced by whether the state of West Virginia ultimately obtains any relief from the Company.

171. While the Board can show it kept itself "informed" it did nothing to ensure the policies and programs put in place were actually effective. There is no evidence that the Special Committee or the Board quested why if a program is in place it was facing one action after another from the DEA and state governments.

172. In addition, the Company focused its efforts to cease the flow of ISOs by the DEA by stifling the authority of the DEA rather than doing more to prevent diversion. The Board knew or should have known of these efforts given the updates they admit to have received in the Special Committee Reports about Cardinal Health's role in the opioid crisis.

173. Cardinal Health succeeded in slowing down in DEA actions by silencing the DEA.

174. In 2013, the pharmaceutical industry, including trade groups of which Cardinal Health was a member, sought to stop these DEA violations by seeking a change to the law that would strip the DEA of its ability to stop the proliferation of opioids.

175. By touting the proposal as a way to ensure that patients who needed pain medications could get them, Cardinal Health and others got a bill introduced in Congress that would effectively slow if not halt the DEAs ability to take action.

176. CBS reported that $106 million was spent on lobbying efforts to have this bill passed – while it is unknown what portion of that was contributed by Cardinal Health or on

behalf of Cardinal Health, given this sum the Board knew or should have known this lobbing effort was underway.

177.    The bill was drafted by a former-DEA agent who left the DEA for a large salary working for a law firm lobbying on behalf of pharmaceutical companies. Having intimate knowledge of the DEA allowed him to create legislation that would cripple the DEAs ability to enforce the CSA.

178.    Eric Holder, the attorney general at the time the bill was being considered, warned the new law would undermine law enforcement efforts to "prevent communities and families from falling prey to dangerous drugs."

179.    And CBS reported that a Justice Department memo confirmed that the legislation Cardinal Health and its competitors lobbied to have enacted "could actually result in increased diversion, abuse, and public health and safety consequences."

180.    The bill ultimately became law and the DEA lost much of its ability to enforce the CSA.

***The Board Continued to Choose Profits Over Saving Lives***

181.    Throughout 2017, numerous cities, counties, and states brought claims against Cardinal Health and others that alleged improper marketing of and inappropriate distribution of various prescription opiate medications into cities, states and towns across the country.

182.    In December 12, 2017, 63 cases were consolidated by the Judicial Panel on Multidistrict Litigation and transferred to the Northern District of Ohio. The consolidated action is captioned, *In re: National Prescription Opiate Litigation*, MDL No. 2804 (the "MDL").

183.    In addition, numerous cases have been filed by Attorneys General across the country in state court. Judge Dan A. Polster, the judge presiding over the MDL, has invited

these Attorneys General to participate in settlement discussions along with the cases consolidated before him in federal court.

184.    The Third Amended Complaint in the MDL alleges that Cardinal Health (and other distributors) had a duty to maintain effective controls to prevent diversion of opioids and failed to maintain adequate controls. The MDL action alleges *a continuing wrong* and seeks actual and punitive damages.

185.    The Third Amended Complaint in the MDL alleges that the defendants, including Cardinal Health, "*have not changed their ways or corrected their past misconduct but instead are continuing to fuel the crisis*" (emphasis added). Specifically, Cardinal Health is being accused of violating RICO, state corruptive practices action, public nuisance, negligence, injury through criminal acts, unjust enrichment and civil conspiracy.

186.    The MDL Third Amended Complaint notes that "Within the next hour, six Americans will die from opioid overdoses; two babies will be born dependent on opioids and begin to go through withdrawal; and drug manufacturers will earn over $2.7 million from the sale of opioids."

187.    The MDL Court set an aggressive schedule for the litigation. Judge Polster divided the action into tracks with the first track scheduled for trial on October 21, 2019. Cardinal Health is a defendant in the track one cases.

188.    On the eve of the October 21, 2019 trial, Cardinal Health (and its co-defendants) reached an agreement to settle this bellwether case for $260 million - $66 million of which is owed by Cardinal Health.

189.    The Bellwether Settlement has resulted in significant financial harm to the Company.

190.     On August 14, 2018, the New York attorney general filed a lawsuit against Purdue Pharmaceuticals and related entities.  On March 28, 2019, the complaint was amended to add in additional facts and defendants, including Cardinal Health (the "New York Action").

191.     The New York Action alleges that Cardinal Health's SOPs were "fundamentally flawed."  And that Cardinal Health "routinely released orders in excess of a customer's threshold."  The flaws in the system included that the system did not allow for the storage or sharing of information about suspicious customers or prescribers.

192.     For example, a Cardinal Health employee had flagged a prescriber, Dr. Dante Cubangbang, as suspicious.  However, because there was no information sharing in the Cardinal Health system, Cardinal Health continued to supply other pharmacies that had Dr. Cubangbang as a top prescriber until just months before Dr. Cubangbang was arrested in 2018 on opioid related charges.

193.     Notably, the New York Action alleges that even when a customer was flagged as suspicious, the orders were filled before any investigation could occur.  Also, Cardinal Health allegedly routinely filled orders in excess of what amounts had been set as acceptable as recently as 2017.

194.     The New York Action alleged that between 2012 and 2017, Cardinal Health reported 12 or more suspicious related opioid ordered in a year for 195 pharmacies in New York – however, Cardinal continued to ship to these pharmacies for more than three years and as of 2018 was still sipping opioids to 149, or 76%, of these pharmacies.  Also, as of 2018, 85% of these flagged pharmacies had filled prescriptions from at least one prescriber that was indicted or convicted on opioid related charges.  Five of these pharmacies had over 50 opioid suspicious orders for three consecutive years, as reported by Cardinal Health to either the DEA or the New

York State Department of Health, but the Company did nothing to stop shipments to these facilities.

195.    In addition, the New York Action alleges that Cardinal Health ignored suspicious activity that was reported by other distributors at pharmacies throughout New York.

196.    The New York Action is not simply based on actions that occurred in the distant past but includes allegations of *continuous wrongdoing*.

197.    On May 8, 2018, Cardinal Health's then former CEO and Executive Chairman, George S. Barrett, testified before the United States House of Representatives Committee on Energy and Commerce, Subcommittee on Oversight and Investigations. During his testimony Barrett told the Committee "With the benefit of hindsight, I wish we had moved faster and asked a different set of questions. I am deeply sorry we did not."

198.    Of course, there is no reason he needed hindsight. The Board had been presented with evidence over the past decade that it was over-supplying opioids to pharmacies nationwide as evidenced by multiple DEA Settlements and other litigation. They simply chose to ignore the facts in front of them and shield themselves from blame by purporting to have creating a comprehensive anti-diversion program.

199.    Understanding that it is facing significant liability for its role in the deaths of thousands of Americans, Cardinal Health has agreed to the proposed Global Settlement. Under this proposed structure Cardinal Health would be liable for $5.63 billion of the total $47 billion. In addition, Cardinal Health would provide free distribution of drugs used to treat overdoses.

200.    This multi-billion dollar settlement and the free distribution program will cause significant harm to the Company's bottom line – harm that could have been averted if the Board was not asleep at the wheel.

201. In addition, even if this Global Settlement does become final governments can choose to opt out resulting in continued litigations and liability to Cardinal Health. The costs of defending these lawsuits alone is significant and a cost that could have been averted.

***Stockholders Took Action but the Company is Still Suffering Harm***

202. The International Brotherhood of Teamsters set forth a proposal for to be voted on at the Company's 2017 Annual Meeting that called for the Board to establish an independent chairperson and asked stockholders to vote to remove the Company's CEO. Two days before the vote, then CEO George Barrett announced his resignation and the Company announced it would be seating an independent chair of the Board.

203. A coalition of institutional investors filed a stockholder resolution in connection with the Company's 2018 proxy. Mercy Investment Services filed the resolution along with nine additional members of the Interfaith Center on Corporate Responsibility and the Connecticut State Treasurer and Comptroller of New York State. The resolution was part of a broader campaign led by Investors for Opioid Accountability ("IOA"), a diverse coalition of investors including 46 faith-based, state and city funds, asset managers and labor funds with over $2.2 trillion in assets who are concerned with the significant legal, reputational and financial risks the opioid crisis poses for distributors and manufacturers.

204. On August 2, 2018, the coalition announced it had withdrawn its resolution and reached a settlement with the Company. As part of the settlement, the Company agreed to provide investors with reports of two board level investigations into allegations of oversight failures related to opioid distribution and to create an Ad Hoc Committee of independent directors of the Board to assist the Board in its oversight of opioid issues. The Company's website explains that the Ad Hoc Committee is:

responsible for assisting the Board in its duty to engage with senior management and to oversee our response to the nationwide problem of prescription opioid abuse by (1) engaging with executives and management regarding our response to the nationwide problem of prescription opioid abuse, and (2) providing advice, regular reports, and recommendations to the Board in connection with those issues.

205. While these stockholder initiatives have taken steps to improve the Board's response to the current opioid crisis the Board had sought to ignore, these steps do not hold the Board financially accountable for the exorbitant costs borne on the Company as a result of defending the over 1,000 lawsuits where they are named as a defendant, the millions of dollars being paid in the Bellwether Settlement, nor do they compensate the Company for the billions of dollars it will ultimately be forced to pay to plaintiffs in these lawsuits, in connection with the potential Global Settlement or other verdicts or settlements, as well as reputational harm endured by Cardinal Health. Furthermore, these steps do not require the Board to oversee an effective anti-diversion program.

### The Board Caused Damage to the Company

206. The opioid crisis and the Defendants' misconduct in overseeing Cardinal Health's role in the opioid crisis has cost and will continue to cost Cardinal Health and its stockholders hundreds of millions of dollars in liability, legal, expert, public relations, investigation expenses, fines, penalties, lost revenue, overtime, lobbying, consulting fees and other related expenses. The misconduct of the Defendants already forced Cardinal Health to pay two record setting penalties for violations associated with the opioid crisis. After entering into the 2008 DEA Settlement with obligations to pay penalties and implements controls and processes to limit Cardinal Health's opioid dumping practices, the misconduct continued unabated.

207. Defendants allowed the Cardinal Health Distribution Centers to distribute controlled substances to pharmacies even though Defendants knew or should have known that

the pharmacists practicing within those pharmacies had failed to fulfill their corresponding responsibility to ensure that controlled substances were dispensed pursuant to prescriptions issued for legitimate medical purposes by practitioners acting in the usual course of their professional practice.  This was a pattern that was repeated on Defendants' watch and should have been prevented by the Company's internal controls put in place in connection with the 2008 Agreements.

208.  Worse still, the Board allowed the conduct to continue after additional ISOs, lawsuits, the 2012 DEA Settlement and 2016 DEA Monetary Settlement and the 2017 West Virginia Settlement.

209.  The Company now faces thousands of lawsuits and billions in liability.  As a result of Defendants' actions, the Company has suffered damages.  These damages include (but are not limited to) $66 million Cardinal Health has agreed to pay in the Bellwether Settlement, the potential $5.63 billion Cardinal Health has agreed to contribute to the Global Settlement, the potential Opt-Out Liability, lost revenues that will occur as a result of the suspension of sales, reputational harm, and legal costs and damages incurred as a result of the attorneys general, state, county, MDL and private litigations and investigations.

## **DEMAND ON THE BOARD WOULD BE FUTILE**

210.  Plaintiff brings this action derivatively in the right and for the benefit of Cardinal Health to redress the breaches of fiduciary duty and other violations of law by Defendants.

211.  Plaintiff will adequately and fairly represent the interests of Cardinal Health and its stockholders in enforcing and prosecuting this type of action.

212.  A majority of the current Board (seven out of ten members), are unable to independently assess demand.

213. Nine out of ten of the Director Defendants (Arnold, Cox, Darden, Downey, Kaufmann, Hall, Kenny, Killefer and Losh) were on the Board, or in the case of Kaufmann a high ranking officer, at the time of the 2012 DEA Administrative Settlement, the West Virginia Settlement, the 2016 DEA Financial Settlement and/or the 2008 DEA Settlements, and thus were on actual notice of Cardinal Health's continuing bad acts. Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful and useless act because Defendants would have been "interested" in (and therefore conflicted from and unable to fairly consider) a demand because they face a substantial likelihood of liability for their role in Cardinal Health's improper misconduct.

214. The Company's own Special Committee reports admit that the Board was responsible for oversight as a result of the Company's response to the opioid crisis. Thus, these Director Defendants understood their role yet failed to probe management about the systems to be put in place to ensure that opioids were not distributed to the wrong persons, instead focusing on making sure there were not "false" reports of those who are not valid customers. It is clear that these Director Defendants were focused on profits as opposed to the long term health of the Company or the clients it serves.

215. Defendants (a majority of the Board) served as directors of the Company during some or all of the wrongdoing alleged herein, and each of the Defendants knew of the wrongdoing but failed to act in the face of a known duty to act. For these reasons, each Defendant faces a substantial likelihood of liability for their participation in the illicit acts. The sustained failure of the Board to ensure effective corporate governance and ensure compliance with the law can only have been a result of the Defendants' knowing breach or reckless disregard for their fiduciary duties. Despite being aware of the Company's prior misconduct concerning

improperly reporting suspicious orders of controlled substances to the DEA and failing to stop the unlawful flow of opioids into states across the nation, the Defendants took inadequate steps in an effort to prevent or remedy the situation, and that failure to take any action resulted in substantial corporate losses. For these reasons, the Defendants' decision to not act was not made in good faith and was contrary to the best interests of the Company.

216. Defendants' conduct resulted in the Company suffering $64 million in fines. This was in violation of, among other things, these Defendants' fiduciary duties of good faith and loyalty, as well as Cardinal Health's own Code of Conduct, Corporate Governance Guidelines and Audit Committee Charter. Thus, Defendants (a majority of the Board) each face a substantial likelihood of personal liability for their acts in connection with these actions, rendering a demand upon them futile.

217. Kaufmann is the current CEO of Cardinal Health, and in that capacity, he receives substantial monetary compensation and other benefits. Furthermore, Kaufmann has been with Cardinal Health for 28 years and in high-ranking executive positions at the time of the bad conduct alleged herein. Cardinal Health admits in its filings with the SEC that Kaufmann is not independent. Kaufmann worked closely with and followed in the footsteps of Cardinal Health's former CEO, Barrett, who was at the helm of the Company at the time of the wrongdoing alleged herein. Thus, Kauffman also is unable to independently assess demand as to the allegation against Barrett. Kaufmann thus lacks independence, rendering him incapable of impartially considering a stockholder demand to commence and vigorously prosecute this action.

218. The Audit Committee Defendants are further conflicted from considering demand because they each face a substantial likelihood of liability as a result of their conduct on the Audit Committee. The Audit Committee's charter imposes specific duties on members of this

committee to ensure compliance with laws, regulations and internal policies. The Audit Committee Defendants violated their fiduciary duties to act in good faith to address the violations of law complained of herein.

219.     A majority of the Board face a substantial likelihood of personal liability because they deliberately disregarded red flags of improper distribution and reporting practices eventually resulting in the Bellwether Settlement, the remaining MDL actions and New York Actions (among other lawsuits nationwide).  Each of the Directors deliberately or recklessly disregarded the Company's misconduct since at least 2012, when Cardinal Health entered into the 2012 Agreements and purported to implement safeguards to prevent the violations of the CSA described herein.

220.     As alleged herein and based on the duties imposed pursuant to the Company's Corporate Governance Guidelines, Ohio law, and the obligations set forth in Cardinal Health's Code of Conduct, the Defendants were aware of indicators and warnings that necessarily informed them of the CSA violations taking place within the Company.

221.     Given these duties placed on the directors of the Board, to the extent any of the Defendants did not have actual knowledge of the repeated violations of the drug distribution and reporting laws taking place within Cardinal Health, such lack of knowledge could only be the product of willful disregard or recklessness that constitutes bad faith of their duties.

## COUNT I

## BREACH OF FIDUCIARY DUTY

222.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

223.    Defendants all owed and owe fiduciary duties to Cardinal Health and its stockholders. By reason of their fiduciary relationships, Defendants specifically owed and owe Cardinal Health the highest obligation of good faith and loyalty in the administration of the affairs of Cardinal Health, including assuring that Cardinal Health complied with federal laws governing, among other things, the distribution or diversion of particular controlled substances and reporting of suspicious orders of controlled substances. The Board also had specific fiduciary duties as defined by the Company's corporate governance documents and principles that, had they been discharged in accordance with the Board's obligations, would have prevented the misconduct and consequent harm to Cardinal Health alleged herein.

224.    Defendants also had a duty to develop and implement an effective anti-diversion program, which Cardinal Health agreed to put in place in connection with the 2007 Agreements with the DEA to ensure that the Company complied with federal law in reporting suspicious orders of controlled substances.

225.    Defendants willfully ignored their obligations under federal law, Cardinal Health's internal controls and numerous warnings and government investigations and inquiries specifically relating to failure to report suspicious orders. Defendants failed to make a good faith effort to correct the problems or prevent their recurrence.

226.    Defendants consciously violated their corporate responsibilities by affirmatively and repeatedly declining to stop and prevent Cardinal Health from failing to maintain effective controls against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels after receiving numerous warnings and indicators, including a prior DEA investigation and fine in connection with the Company's failure to comply with the CSA.

227.    Defendants consciously violated their corporate responsibilities by ignoring red flags and failing to ensure that Cardinal Health complied with its affirmative duty to implement and comply with the anti-diversion program, as required by the 2007, 2012 and 2016 DEA Agreements.

228.    Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the business of Cardinal Health in a manner consistent with the duties imposed upon them by law.

229.    By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence and loyalty in the management and administration of Cardinal Health's affairs and in the use and preservation of Cardinal Health's assets.

230.    As a direct and proximate result of the Defendants' conscious failure to perform their fiduciary obligations, Cardinal Health has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, the substantial penalties, fines, sales suspension and expenses described herein.

231.    As a result of the misconduct alleged herein, Defendants are liable to the Company.

## RELIEF REQUESTED

**WHEREFORE**, Plaintiff demands judgment as follows:

A.    Determining that this action is a proper derivative action maintainable under law and demand on the Cardinal Health Board is excused;

B.    Awarding against all Defendants and in favor of the Company the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

C.      Awarding to Cardinal Health restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

D.      Directing Cardinal Health to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its stockholders from a recurrence of the damaging events described herein;

E.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury.

Dated: December 6, 2019

Of Counsel:

GARDY & NOTIS, LLP
Jennifer Sarnelli
James S. Notis
126 East 56th Street, 8th Floor
New York, NY 10022
Tel: 212-905-0509
Fax: 212-905-0508
jnotis@gardylaw.com
jsarnelli@gardylaw.com

/s/ Richard S. Wayne
Richard S. Wayne (0022390)
William K. Flynn (0029536)
Robert R. Sparks (0073573)
STRAUSS TROY CO., LPA
150 E. Fourth Street
Cincinnati, OH 45202-4018
Tel : 513-621-2120
Fax: 513-629-9426
rswayne@strausstroy.com
wkflynn@strausstroy.com
rrsparks@strausstroy.com

*Attorneys for Plaintiff Melissa Cohen*

## VERIFICATION

I, Melissa Cohen, hereby declare and verify that I am a stockholder of Cardinal Health Inc. I have authorized the filing of the attached Amended Verified Stockholder Derivative Complaint for Breach of Fiduciary Duties ("Amended Complaint"). I have reviewed the Amended Complaint, and based upon the discussions with and reliance upon my counsel, and as to those facts upon which I have personal knowledge, the facts therein are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 12/3/19

MELISSA COHEN