# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |
|---|---|
| : | |
| **IN RE CARDINAL HEALTH, INC. DERIVATIVE LITIGATION** | **Case No. 2:19-cv-2491** <br> **Judge Sarah D. Morrison** <br> **Chief Magistrate Judge Elizabeth A. Preston Deavers** |
| : | |

## OPINION AND ORDER

This matter is before the Court for consideration of Defendants' Motion to Dismiss the Consolidated Verified Shareholder Derivative Complaint. (Mot. to Dismiss, ECF No. 43.) Plaintiffs filed their Memorandum in Opposition (Memo. in Opp'n, ECF No. 47) to which Defendants have replied (Reply, ECF No. 48). The Court heard oral argument on the Motion on January 21, 2021. For the reasons set forth below, the Motion is **GRANTED IN PART** and **DENIED IN PART**.

## I.    BACKGROUND

At its heart, this case is about negative externalities. "Negative externalities" is a term of art used by economists to describe the phenomenon of a firm's operations creating societal costs that are not captured by the market price of the firm's products.[1] Air pollution is a classic example. Negative externalities are generally recognized as a market failure, because the price of a product should

---

[1] For more information, see: *The Economic Lowdown Podcast Series: Externalities*, FEDERAL RESERVE BANK OF ST. LOUIS (available online at https://www.stlouisfed.org/education/economic-lowdown-podcast-series/episode-11-externalities); Thomas Helbling, *Externalities: Prices Do Not Capture All Costs*, INTERNATIONAL MONETARY FUND (Feb. 24, 2020), https://www.imf.org/external/pubs/ft/fandd/basics/external.htm.

account for the true cost of its production. When the societal costs reach a certain magnitude, the firm is often forced—by regulation, taxation, litigation, or a combination thereof—to 'internalize' the costs. The thrust of the claims now before the Court is that the directors and officers of this firm, Nominal Defendant Cardinal Health, Inc., failed (or refused) to mitigate the societal costs of Cardinal Health's business in the face of increasing evidence that the company would be forced to bear them.

All well-pled factual allegations in the Consolidated Verified Shareholder Derivative Complaint (Consol. Compl., ECF No. 35) are considered as true for purposes of the Motion to Dismiss. *See Gavitt v. Born*, 835 F.3d 623, 639–40 (6th Cir. 2016). The following summary draws from the allegations in that Consolidated Complaint, the documents integral to and incorporated therein, and certain other documents which are subject to judicial notice.

### A.    Parties

#### 1.    Nominal Defendant Cardinal Health, Inc.

Cardinal Health is a publicly traded Ohio corporation headquartered in Dublin, Ohio. (Consol. Compl., ¶ 22.) The sixteenth largest company in the United States, Cardinal Health's recent annual revenues topped $135 billion. (*Id.*, ¶ 41.) Cardinal Health generally operates two business lines, Medical and Pharmaceutical, which are separately managed and reported. (*Id.*, ¶ 42.) The Medical segment manufactures, sources, and distributes medical, surgical, and laboratory products. (*Id.*) The Pharmaceutical segment distributes pharmaceutical and over-the-counter healthcare products. (*Id.*) On average, the Pharmaceutical

segment accounted for 90.0% of all Cardinal Health revenue for the ten-year period ending in 2018. (*Id.*, ¶ 43.)

Cardinal Health is one of the three largest distributors of pharmaceutical products in the country. (*Id.*, ¶¶ 3, 22, 66.) A distributor purchases pharmaceutical products from the manufacturers and sells them to pharmacies, where they are then dispensed to patients. (*Id.*, ¶ 44.) The distributor's position in the pharmaceutical supply chain makes it uniquely capable to identify and stunt diversion of prescription drugs for illegal use. (*Id.*, ¶ 69.) It is no surprise, then, that the law imposes certain obligations on distributors in this respect.

At the federal level, the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. § 801, *et seq.* and its implementing regulations (also known as the "Controlled Substances Act" or "CSA") affirmatively requires distributors of controlled substances[2] to, *inter alia*:

- Maintain effective controls against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels;

- Design and operate a system to identify suspicious orders of controlled substances;

- Inform the Drug Enforcement Administration ("DEA") of suspicious orders when discovered; and

---

[2] Several prescription opioids, including hydrocodone and oxycodone, are listed as Schedule II controlled substances. Schedule II controlled substances: (i) have a high potential for abuse; (ii) have a currently accepted medical use; and (iii) if abused, may lead to severe psychological or physical dependence. 21 U.S.C. § 812(b)(2); 21 C.F.R. § 1308.12. (*See also* Consol. Compl., ¶ 47.)

Distributors of controlled substances are required to obtain an annual registration from the DEA. 21 U.S.C. § 822(a)(1); 21 C.F.R. § 1301.11(a). (*See also* Consol. Compl., ¶ 48.) The obligations listed here are requirements for obtaining or maintaining registration.

- Conduct meaningful diligence to avoid filling suspicious orders that might be improperly diverted.

21 U.S.C. §§ 823(b), 832(a); 21 C.F.R. § 1301.74(b). (*See also* Consol. Compl., ¶¶ 4, 49.) Suspicious orders are defined to include "orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." 21 C.F.R. § 1301.74(b). (*See also* Consol. Compl., ¶ 49.)

The DEA is charged with enforcing the CSA. *See generally*, 21 C.F.R. Ch. II. Among other enforcement tools, the DEA may deny, revoke, or suspend a distributor's registration if it determines the distributor is operating in violation of the CSA, or if its actions are inconsistent with the public interest. *See* 21 U.S.C. §§ 823(b), 824. (*See also* Consol. Compl., ¶ 50.)

### 2. Plaintiffs

Plaintiffs Melissa Cohen, Stanley M. Malone, and Michael Splaine own shares in Cardinal Health. Ms. Cohen purchased her shares in September 2001 (Consol. Compl., ¶ 19); Mr. Malone purchased his shares in January 2004 (*Id*., ¶ 20); and Mr. Splaine purchased his shares in August 2015 (*Id*., ¶ 21). Each has maintained ownership since that date. (*Id*., ¶¶ 19–21.)

### 3. Individual Defendants

Plaintiffs bring this action, for the benefit of Cardinal Health, against the following current and former members of Cardinal Health's Board of Directors and executive management team: David J. Anderson, Colleen F. Arnold, George S. Barrett, Carrie S. Cox, Calvin Darden, Bruce L. Downey, Patricia A. Hemingway

Hall, Akhil Johri, Clayton M. Jones, Michael C. Kaufmann, Gregory B. Kenny, Nancy Killefer, David P. King, and J. Michael Losh. (*See generally, id.*)

Mr. Anderson served on the Board from 2014 until September 5, 2018. (*Id.*, ¶ 23.) Mr. Anderson was a member of the Audit Committee from 2014 through 2018. (*Id.*)

Ms. Arnold has served on the Board since 2007. (*Id.*, ¶ 24.) Ms. Arnold was a member of: the Nominating and Governance Committee from 2010 through 2018; the Audit Committee from 2009 through 2010; and the Compensation Committee in 2008. (*Id.*) Ms. Arnold rejoined the Audit Committee in 2018. (*Id.*)

Mr. Barrett served as CEO and Chairman from 2009 through 2017. (*Id.*, ¶ 25.) At the end of 2017, Mr. Barrett stepped down as CEO, but continued to serve as Executive Chairman until November 2018. (*Id.*)

Ms. Cox has served on the Board since 2009. (*Id.*, ¶ 26.) Ms. Cox was a member of the Audit Committee from 2010 through 2013. (*Id.*) She has also been a member of the Compensation Committee since 2014, and the Ad Hoc Committee since 2018. (*Id.*)

Mr. Darden has served on the Board since 2005. (*Id.*, ¶ 27.) Mr. Darden has been a member of the Compensation Committee since 2005, and the Ad Hoc Committee since 2018. (*Id.*)

Mr. Downey has served on the Board since 2009. (*Id.*, ¶ 28.) Mr. Downey was a member of the Audit Committee from 2009 through September 2019. (*Id.*) He has

been a member of the Nominating and Governance Committee and the Ad Hoc Committee since 2018. (*Id*.)

Ms. Hemingway Hall has served on the Board since 2013. (*Id*., ¶ 29.) Ms. Hemingway Hall was a member of the Audit Committee from November 2013 through 2018. (*Id*.) She has also been a member of the Nominating and Governance Committee since 2015 and the Compensation Committee since November 2018. (*Id*.)

Mr. Johri has served on the Board since February 2018. (*Id*., ¶ 30.) Mr. Johri has been a member of the Audit Committee since that time. (*Id*.)

Mr. Jones served on the Board from 2012 through 2018. (*Id*., ¶ 31.) Mr. Jones was a member of the Compensation Committee from 2013 through 2014, and the Audit Committee from 2014 through 2018. (*Id*.)

Mr. Kaufmann has served on the Board since he became CEO of Cardinal Health on January 1, 2018. (*Id*., ¶ 32.) Mr. Kaufmann was CEO of the Pharmaceutical segment from April 2008 to November 2014, and CFO of the company from November 2014 through 2017. (*Id*.)

Mr. Kenny has served on the Board since 2007. (*Id*., ¶ 33.) Mr. Kenny succeeded Mr. Barrett as Executive Chairman. (*Id*.) He was a member of the Audit Committee from August to November 2007, and the Compensation Committee from 2008 through 2014. (*Id*.) Mr. Kenny has been a member of the Nominating and Governance Committee since 2009 and the Ad Hoc Committee since 2018. (*Id*.)

Ms. Killefer has served on the Board since 2015. (*Id*., ¶ 34.) Ms. Killefer has been a member of the Compensation Committee since that time. (*Id*.)

6

Mr. King served on the Board from 2011 through 2018. (*Id.*, ¶ 35.) Mr. King was a member of the Audit Committee from November 2011 through 2013, and the Compensation Committee from November 2013 through 2018. (*Id.*)

Finally, Mr. Losh served on the Board from 1996 to 2009, and rejoined in December 2018. (*Id.*, ¶ 36.) Mr. Losh was a member of the Audit Committee in 2008, and has served again in that capacity since 2018. (*Id.*)

**B.   Factual Background**

Plaintiffs have availed themselves of the Ohio law permitting them to examine Cardinal Health's books and records of account, together with the minutes of the proceedings of its Board and committees of the Board (the "Books and Records"). (Consol. Compl., preamble. *See also* Ohio Rev. Code § 1701.37.)

**1.   Board Governance**

Cardinal Health's Board is organized and operates in accordance with internal governing documents, including the Corporate Governance Guidelines and various committee charters. (Consol. Compl., ¶ 82.) The Corporate Governance Guidelines provide, in part:

> The Board, operating directly and through its committees, fulfills the following primary functions:
>
> 1. Oversee management in the conduct of Cardinal Health's business;
>
> 2. Oversee management's efforts to establish and maintain for the Company high standards of legal and ethical conduct in all of its businesses, including conformity with all applicable laws and regulations; . . .

7

      3.   Oversee management's efforts to protect the assets of Cardinal Health through the maintenance of appropriate accounting, financial reporting and financial and other controls;

      4.   Oversee the Company's policies and procedures for assessing and managing risk; [and]

      5.   Provide advice and counsel to senior management. . . .

(*Id.*, ¶ 83.)

Pursuant to its Charter, the Audit Committee is charged with "assist[ing] the Board in monitoring . . . the Company's ethics and compliance program and compliance with legal and regulatory requirements [and] the Company's processes for assessing and managing risk." (*Id.*, ¶ 87.) It carries out this task by reviewing regular reports from Cardinal Health's Chief Legal and Compliance Officer, and discussing significant risks with in-house counsel and management. (*Id.*, ¶ 89.) Until the Ad Hoc Committee was established in 2018, the Audit Committee was the only Board committee expressly tasked with a regulatory compliance function. (*Id.*, ¶ 87.)

The Compensation Committee annually reviews and approves corporate goals and objectives relevant to the CEO's compensation, evaluates the CEO's performance in light of those goals and objectives, and determines and approves the CEO's compensation based on the evaluation. (*Id.*, ¶ 90.) The Compensation Committee is also responsible for overseeing the evaluation of, and reviewing and approving compensation for, Cardinal Health's other Section 16 officers.[3] (*Id.*)

---

[3] As defined in 17 C.F.R. § 240.16a-1(f).

2.    **2008 Settlement**

Autumn 2007 brought a flurry of DEA activity for Cardinal Health. First, on September 19, the DEA executed a civil warrant for inspection of Cardinal Health's distribution facility in Stafford, Texas. (*Id.*, ¶ 93.) The warrant sought documents and information relating to Cardinal Health's distribution of hydrocodone. (*Id.*) The Audit Committee was apprised of the warrant three weeks later. (*Id.*)

Between November 28 and December 7, the DEA issued Orders to Show Cause and Immediate Suspensions of Registration for Cardinal Health's facilities in Lakeland, Florida; Auburn, Washington; and Swedesboro, New Jersey. (*Id.*, ¶ 94.) The Orders allege that the facilities "constitute[d] an imminent danger to the public health and safety" for failure to maintain effective controls against diversion of controlled substances. (*Id.*) A special meeting of the Board was held on December 12, 2007, to discuss the Lakeland, Auburn, and Swedesboro Orders. (*Id.*, ¶ 95.)

The following day, Cardinal Health's chief executive, financial, and legal officers met with DEA representatives. (*Id.*, ¶ 96.) As a result of that meeting, Cardinal Health authorized a review of the company's anti-diversion practices at all distribution facilities. (*Id.*) Cardinal Health also began implementing "enhancements" to established anti-diversion and suspicious order monitoring programs, including "a computerized order monitor and control system." (*Id.*) The Audit Committee was apprised of this information in a meeting on January 14, 2008. (*Id.*)

In preparation for a January 31 meeting, the full Board received a report from the CFO detailing the Orders' impact on Cardinal Health's business and an

"action plan" identifying various anti-diversion and suspicious order monitoring program enhancements. (*Id.*, ¶¶ 98, 99.) The report was dated January 23, 2008. (*Id.*, ¶ 98.)

On January 25, the DEA served Cardinal Health with an administrative subpoena, requesting documents relating to the company's CSA compliance. (*Id.*, ¶ 101.) That same week, the DEA issued yet another Order to Show Cause—this time, pertaining to the Stafford facility. (*Id.*) Although the Order did not suspend the Stafford facility's license, Cardinal Health voluntarily suspended operation of the Stafford facility and ParMed Pharmaceuticals, Inc. (Cardinal Health's generic pharmaceutical telemarketing distribution arm) to enhance anti-diversion controls. (*Id.*)

The Board was alerted to the Stafford/ParMed voluntary suspension in February 2008, but was not made aware of the administrative subpoena until May 7, 2008. (*Id.*, ¶¶ 101, 102, 105.) At the May 7 meeting, the Board was also provided a report on the progress of CSA compliance enhancement efforts (*Id.*, ¶ 102) and a nascent Ohio Board of Pharmacy investigation into the company's Findlay, Ohio distribution facility (*Id.*, ¶ 106). Specifically, the investigation centered around allegations that the Findlay facility "made suspicious sales" to a pharmacy in Dublin. (*Id.*)

On August 7, 2008, Cardinal Health and the DEA reached an agreement in principle to resolve the facility registration suspensions. (*Id.*, ¶ 108.) The Audit Committee was made aware of the tentative agreement on August 18, 2008, but

there is no indication that the Board played an active part in negotiating the settlement. (*Id.*) The Settlement and Release Agreement and Administrative Memorandum of Agreement (the "2008 Settlement") was executed a few weeks later. (*Id.*, ¶ 109. *See also* Mot. to Dismiss Ex. 1, ECF No. 43-1.)

The 2008 Settlement begins by reciting the circumstances surrounding the Auburn, Lakeland, Swedesboro, and Stafford Orders. (*Id. See also* Mot. to Dismiss Ex. 1, PAGEID # 1849.) It goes on to state that the DEA alleged Cardinal Health failed to maintain effective anti-diversion controls at three additional facilities—McDonough, Georgia; Valencia, California; and Denver, Colorado—and that Cardinal Health failed to report suspicious orders of controlled substances. (*Id. See also* Mot. to Dismiss Ex. 1, PAGEID # 1849–50.) In exchange for a release of claims for certain violations occurring prior to October 2008 and reinstatement of the suspended facility registrations, Cardinal Health was required to:

- Maintain a compliance program designed to detect and prevent diversion of controlled substances—including procedures for reviewing orders of controlled substances. Per those procedures, a Cardinal Health employee trained to detect suspicious orders should be required to review orders exceeding certain thresholds, or meeting other criteria, to determine whether the order should be marked as suspicious, not filled, and reported to the DEA;

- Provide DEA Headquarters with a monthly report of all sales of controlled substances;

- Inform DEA Headquarters of suspicious orders (as opposed to the local DEA Field Office, as is normal practice);

- Review distribution of oxycodone, hydrocodone, alprazolam, and phentermine to retail pharmacy customers and physicians for the preceding 18 months to identify customers whose purchases exceeded the thresholds in Cardinal Health's compliance program, and conduct

11

an investigation as to each customer whose purchasing patterns were found to substantially deviate from the norm; and

- Pay $34,000,000 to the United States.

(Mot. to Dismiss Ex. 1, PAGEID # 1850–52. *See also* Consol. Compl., ¶¶ 110, 111.) At the time, the $34 million settlement payment was the largest ever associated with a DEA registration suspension. (Consol. Compl., ¶ 111.) The Board received a report on the 2008 Settlement at its November 5, 2008 meeting. (*Id.*, ¶ 113.) However, the Books and Records reflect that the Board took no further action on the subject. (*Id.*)

### 3.    2012 Settlement

Just six months after the 2008 Settlement, on April 23, 2009, the Audit Committee was alerted to yet another issue: The DEA had notified Cardinal Health that its compliance review of the Valencia facility was "unsatisfactory." (*Id.*, ¶ 115.) Specifically, the DEA found that the Valencia facility failed to: maintain effective anti-diversion controls; detect and report suspicious orders; and meaningfully investigate new and existing customers' legitimate needs to purchase or order controlled substances. (*Id.*) The Board was also informed that Cardinal Health had already objected to the DEA's findings. (*Id.*) The Board did not take any additional action in response to this news. (*Id.*, ¶ 116.)

At an August 2009 Board meeting, Craig Morford, Cardinal Health's new Chief Legal and Compliance Officer, provided an update on compliance efforts and reported that the company had designed and implemented an effective suspicious

order monitoring program. (*Id*.) According to Plaintiffs' review of the Books and Records, the Board did not press Mr. Morford on the subject. (*Id*., ¶ 117.)

In late December 2010, Cardinal Health acquired Kinray, Inc., a pharmaceutical distributor servicing the New York metropolitan area. (*Id*., ¶ 118.) In January 2011, Mr. Morford informed the Audit Committee that the "Kinray 100 day integration plan, including suspicious order monitoring, Standards of Business Conduct and policy and compliance training" was still in development. (*Id*.)

On July 7, 2011, Cardinal Health representatives attended a meeting at DEA Headquarters. (*Id*., ¶ 119.) During that meeting, the DEA advised Cardinal Health that it needed to examine its Florida customers, including retail chain pharmacies. (*Id*.) The Books and Records do not reflect if or when the Board was made aware of this meeting. (*Id*.)

Later that month, the Board received a memo from Mr. Morford outlining key initiatives and accomplishments for the fiscal year. (*Id*., ¶ 120.) The memo celebrated enhancements to the suspicious order monitoring program that "substantially decreased the number of false positives and reduced customer issues associated with unwarranted supply delays." (*Id*.) The memo did not discuss the new program's effectiveness at actually flagging suspicious orders. (*Id*.)

Mr. Morford subsequently provided additional detail on the monitoring program's performance, touting:

- "[R]educed incidence of flagged events by 2,509, or 37%, when compared to FY10 thanks to the implementation of more accurate detection systems[;]"

13

- A total of 47 suspicious orders reported across all distribution facilities for fiscal year 2011 (an increase of 17 from the previous fiscal year); and

- A 40% decrease in the number of customers blocked from purchasing controlled substances.

(*Id.*, ¶¶ 130–31.) The later report also disclosed four negative findings in routine DEA inspections of Cardinal Health facilities during fiscal years 2011 and 2012, and an additional six negative findings in Kinray facilities. (*Id.*, ¶¶ 130, 132.)

On October 26, 2011, the DEA issued a warrant to inspect the Lakeland facility and collect records pertaining to its distribution of controlled substances. (*Id.*, ¶ 125. *See also* Decl. of Joseph Rannazzisi, ¶ 74, D.D.C. No. 1:12-cv-185-RBW, ECF No. 14-2.) The Board was notified of the warrant the following month. (*Id.*, ¶ 128.) The DEA's investigation resulted in an Order to Show Cause and Immediate Suspension of Registration for the Lakeland facility, issued on February 2, 2012. (*Id.*, ¶ 136. *See also* Mot. to Dismiss Ex. 2, ECF No. 43-2, PAGEID # 1909–14.)  The Order alleges:

> Despite the [2008 Settlement], the specific guidance provided to Cardinal by DEA, and despite the public information readily available regarding the oxycodone epidemic in Florida, Cardinal has failed to maintain effective controls against the diversion of controlled substances into other than legitimate medical, scientific, and industrial channels . . . .
>
> Notwithstanding the large quantities of controlled substances ordered by Cardinal's top retail pharmacy customers, Cardinal failed to conduct meaningful due diligence to ensure that the controlled substances were not diverted into other than legitimate channels, including Cardinal's failure to conduct due diligence of its retail pharmacy chain customers. Furthermore, Cardinal failed to detect and report suspicious orders of oxycodone products by its pharmacy customers . . . . In addition, Cardinal's conduct described herein violated the provisions of the [2008 Settlement].

14

(Mot to Dismiss Ex. 2, PAGEID # 1911–12. *See also* Consol. Compl., ¶ 136.) The DEA's allegations principally centered on the Lakeland facility's relationship with four Florida pharmacies, including two CVS locations, Gulf Coast Pharmacy, and Caremed Health Corporation. (Mot to Dismiss Ex. 2, PAGEID # 1911–12.) Its investigation had revealed: astronomical increases in orders from these four pharmacies in the preceding years; a regular practice on Cardinal Health's part of increasing the pharmacies' suspicious order triggering threshold; and an unwillingness by Cardinal Health to conduct on-site due diligence visits. (Consol. Compl., ¶¶ 137–49.) The day after the Lakeland Order was issued, Cardinal Health filed suit seeking to restrain the DEA from taking action against the Lakeland registration.[4] (*Id.*, ¶ 151.) The Audit Committee was informed of these developments on April 24, 2012, and the full Board received an update the following week. (*Id.*)

Ultimately, the Lakeland matter was resolved out of court, in an Administrative Memorandum of Agreement signed on May 15, 2012 (the "2012 Settlement"). (*Id.*, ¶ 153. *See also* Mot. to Dismiss Ex. 2.) Under the 2012 Settlement, Cardinal Health was required to:

- Maintain a compliance program designed to detect and prevent diversion of controlled substances—including procedures for reviewing orders of controlled substances;

- Initiate procedures to ensure that any customer known or suspected to be diverting controlled substances would receive a site visit or anonymous site inspection by a Cardinal Health employee or other qualified third-party inspector;

---

[4] *Cardinal Health Inc. v. Holder*, Case No. 1:12-cv-185-RBW (D.D.C. 2012).

- Review and enhance its processes for establishing and increasing thresholds—including requiring two-person concurrence before increasing thresholds for higher volume customers for specific drug classes;

- Create a Large Volume Tactical and Analytical Committee to review and make decisions regarding high volume customers;

- Generally enhance customer due diligence processes; and

- Continue to report sales and suspicious orders to DEA Headquarters.

(Mot. to Dismiss Ex. 2, PAGEID # 1900–01. *See also* Consol. Compl., ¶ 154.) Most notably, the 2012 Settlement required Cardinal Health to suspend controlled substances distribution from the Lakeland facility for two years. (Mot. to Dismiss Ex. 2, PAGEID # 1901. *See also* Consol. Compl., ¶ 154.) The suspension would be lifted in May 2014, provided that the company complied with the 2012 Settlement. (Mot. to Dismiss Ex. 2, PAGEID # 1902. *See also* Consol. Compl., ¶ 154.)

### 4. Post-2012 Settlement

The 2012 Settlement was followed by more lawsuits and investigations. On June 26, 2012, the Attorney General for the State of West Virginia filed suit seeking injunctive relief and money damages under West Virginia's version of the CSA, and further money damages for unfair trade practices, public nuisance, unjust enrichment, negligence, and antitrust claims. (Mot. to Dismiss Ex. 8, ECF No. 43-8. *See also* Consol. Compl., ¶ 159.) The Board was alerted to the West Virginia lawsuit the day after its filing. (Consol. Compl., ¶ 159.) In July 2012, Cardinal Health representatives attended a meeting with the DEA, where it was revealed that the company may yet face a penalty for failure to report suspicious orders, and that it was under investigation by four different U.S. Attorneys' Offices on allegations of

16

other unlawful practices. (*Id.*, ¶ 160.) The Audit Committee was informed of the meeting later that month. (*Id.*)

All the while, the Board continued to receive regular reports on compliance activities. (*Id.*, ¶¶ 155, 156, 161.) Notably, in August 2012, Mr. Morford, Mr. Kaufmann (then serving as CEO of the Pharmaceutical segment), and outside counsel delivered a presentation to the Board on Cardinal Health's "Post-2007 Anti-Diversion Program." (*Id.*, ¶ 155.) An apparent post-mortem on the 2012 Settlement, the report observed that Cardinal Health's post-2007 anti-diversion program "[f]ocused on reporting those customers we believed were truly suspicious" in order to "[a]void overwhelming DEA by over-reporting orders of interest," and that the company had "[v]iewed lack of negative feedback as positive guidance." (*Id.*) Reports otherwise were rosy and brief. (*Id.*, ¶¶ 156, 161.) The Books and Records reveal no pushback, questioning, or demands on the part of the Board. (*Id.*, ¶ 157.)

The next significant developments came in 2014. At the Board's May 7 meeting, Mr. Morford gave a presentation on the regulatory environment and compliance with the 2012 Settlement. (*Id.*, ¶ 162.) The presentation represented that the company was in compliance with the 2012 Settlement. (*Id.*) It also gave a brief description of post-2012 anti-diversion efforts, without addressing those efforts' effectiveness. (*Id.*) At the same meeting, the Board was notified that the Maryland U.S. Attorney's Office had offered to settle its pending investigation for $59.4 million. (*Id.*) The Board did not take any action in response to these updates. (*Id.*)

17

At the next quarterly meeting, Mr. Morford discussed CSA compliance and the regulatory and litigation landscape, including an update on the West Virginia lawsuit. (*Id.*, ¶ 163.) Mr. Morford's presentation noted that the company was conducting audits and gap assessments, continuing to enhance the compliance program, and continuing to monitor compliance with the 2012 Settlement. (*Id.*) Anti-diversion compliance issues were also discussed among the Audit Committee at an October 27 meeting. (*Id.*, ¶ 164.) At that meeting, the Audit Committee discussed the company's $26.5 million reserve for civil fines resulting from the DEA's ongoing investigation. (*Id.*)

Months passed. In August 2015, the Board received an update on CSA compliance in Mr. Morford's annual compliance report. (*Id.*, ¶ 167.) Separately, the Audit Committee learned of continuing compliance deficiencies through an amended complaint filed in the West Virginia litigation. (*Id.*, ¶ 168. *See also* Mot. to Dismiss Ex. 9, PAGEID # 2091, ECF No. 43-9.)

### 5. 2016 Settlements

CSA compliance next resurfaced in late-2016, when the Washington Post published two investigative reports that called into question pharmaceutical distributors'—including Cardinal Health's—role in the opioid epidemic. (*Id.*, ¶ 171.) On October 22, the paper published "Investigation: The DEA Slowed Enforcement While the Opioid Epidemic Grew Out of Control." (*Id.*) Two days later, it published "Red Flags Didn't Halt Flow of Pills to Black Market." (*Id.*) The Board received copies of both articles in an investor relations packet the following week. (*Id.*)

On December 17, 2016, a similar article appeared in the West Virginia Gazette-Mail. (*Id.*, ¶ 175.) In "Drug firms poured 780M painkillers into WV amid rise of overdoses," Eric Eyre reported on the role of distributors in the prescription drug crisis then crippling the state.[5] (*Id.*)

Before the close of that year, Cardinal Health would enter into three settlement agreements, agreeing to pay significant sums to resolve claims surrounding its distribution of controlled substances. First, Cardinal Health entered into a December 20, 2016 Settlement Agreement with U.S. Attorney's Offices in Florida, Maryland, and Washington. (Mot. to Dismiss Ex. 3, ECF No. 43-3. *See also* Consol. Compl., ¶ 176.) In that Agreement, Cardinal Health "admit[ted], accept[ed], and acknowledge[d] [its] responsibility for" failing to report suspicious orders from the Lakeland facility between January 1, 2009, and May 14, 2012. (Mot. to Dismiss Ex. 3, PAGEID # 1934.) The Agreement required Cardinal Health to pay $34 million to resolve the civil investigations into the admitted and other alleged CSA violations dating back to January 2009. (*Id.*, PAGEID # 1935–36.) Near simultaneously, the U.S. Attorney's Office for the Southern District of New York filed a complaint and consent order in federal court. (Mot. to Dismiss Exs. 6, 7, ECF Nos. 43-6, 43-7.) The complaint alleged that Kinray also failed to report suspicious orders between January 1, 2009, and May 14, 2012. (Mot. to Dismiss Ex. 7.) In the consent order, Kinray admitted to the violations and agreed to a $10 million settlement payment. (Mot. to Dismiss Ex. 6. *See also* Consol. Compl., ¶ 177.) Next,

---

[5] Mr. Eyre won a Pulitzer Prize in 2017 for his reporting in this and accompanying pieces. *See* https://www.pulitzer.org/winners/eric-eyre.

the judge presiding over the West Virginia case announced that a settlement had been reached. (Consol. Compl., ¶ 178. *See also* Mot. to Dismiss Ex. 9.) The settlement required Cardinal Health to pay another $20 million to dismiss the case. (Consol. Compl., ¶ 178.)

At their February 2017 meetings, the Audit Committee and the full Board briefly discussed the litigation updates—although, there is no indication that they discussed CSA compliance otherwise. (*Id.*, ¶¶ 179, 180.)

### 6.   Post-2016 Settlements

The frenzy re-focused public attention on Cardinal Health. In March 2017, Senator Claire McCaskill, then-ranking member of the U.S. Senate Committee on Homeland Security and Government Affairs, initiated an inquiry into DEA anti-diversion activity and asked, quite bluntly, whether the agency was sufficiently independent from the pharmaceutical industry to effectively carry out its enforcement mission. (*Id.*, ¶ 181.) Cardinal Health also began to hear from institutional investors. The International Brotherhood of Teamsters sent a letter to the Board, asking it to take certain corporate compliance and governance measures to address its role in the opioid epidemic and curb losses. (*Id.*)

At meetings held in April 2017, the Board received an update on controlled substance regulation, including Cardinal Health's compliance program, "litigation landscape and defense strategy," and federal and state agency and legislative activity. (*Id.*, ¶ 185.) The presentation did not include a discussion of the Cardinal Health compliance program's track-record or effectiveness. (*Id.*) It did, however, include extensive discussion of a public relations strategy for 'reorienting' the

20

narrative, which involved forming a media "war room," offering "aggressive counter-narratives" on-background or off-the-record, engaging in "opportunistic outreach," and positioning Cardinal Health as "part of the solution." (*Id.*)

On May 9, 2017, the U.S. House of Representatives Energy and Commerce Committee initiated a bipartisan investigation into prescription opioid distribution. (*Id.*, ¶ 186.) In July, Senator McCaskill sent a letter to Cardinal Health requesting information on its DEA registration suspensions, suspicious order notifications, compliance metrics, and executive compensation policies. (*Id.*, ¶¶ 187, 188.) The Books and Records reflect that the Board was made aware of both congressional inquiries. (*Id.*, ¶ 188.)

The Board received reports on government and public reaction to the opioid crisis, and the company's strategy for response, at meetings in August and November of 2017. (*Id.*, ¶¶ 189, 190, 192, 193.) However, the minutes reflect that the Board still made no effort to determine whether Cardinal Health was in compliance with the CSA's requirements. (*Id.*)

Pressure on Cardinal Health reached a fever pitch around the turn of 2018. The Judicial Panel on Multi-District Litigation centralized opioid litigation in the Northern District of Ohio.[6] (*Id.*, ¶ 194.) Mr. Barrett stepped down as CEO. (*Id.*, ¶ 195.) A coalition of shareholders, self-styled as the Investors for Opioid Accountability, sent a letter to Cardinal Health seeking changes to the company's governance practices in connection with the opioid crisis. (*Id.*, ¶ 201.) And, in mid-

---

[6] *In re Nat'l Prescription Opioid Litig.*, MDL No. 2804.

February, the House Energy and Commerce Committee sent Cardinal Health a letter requesting information relevant to its inquiry, and commanding Mr. Barrett's appearance before it for testimony later that spring. (*Id.*, ¶ 199.)

The Board received an update on the company's anti-diversion program and opioid litigation at its February 6, 2018 meeting. (*Id.*, ¶ 196.) Notably, outside counsel also gave a presentation on the Board's fiduciary duties, "including the directors' duties of loyalty and care and the Board's duty to exercise oversight of the Company's response to the opioid epidemic." (*Id.*) Only then did the Board resolve to create a committee to "assist the Board in administering its oversight responsibilities for the Company's response to the opioid epidemic." (*Id.*, ¶ 197.) The Ad Hoc Committee was formally established on February 20, 2018, with the following charge:

> [T]o assist the Board in its duty to engage with senior management and to oversee the company's response to the nationwide problem of prescription opioid abuse by (1) engaging with and overseeing the Company's senior executives and management regarding the Company's response to that problem and (2) providing advice, regular reports and recommendations to the Board in connection therewith[.]

(*Id.*) Messrs. Darden, Downey, and Kenny and Ms. Cox were appointed to the Ad Hoc Committee. (*Id.*, ¶ 198.)

The Ad Hoc Committee first met on March 9, 2018, when the members discussed:

- Engagement with shareholders, including the Investors for Opioid Accountability;

- Opioid litigation, including status of the multi-district litigation and meetings between management and various state Attorneys General;

- Government opioid initiatives at the Department of Justice and in state legislatures; and

- The pending House Energy and Commerce Committee investigation.

(*Id.*, ¶ 202.) The Ad Hoc Committee also discussed the company's anti-diversion program, but the Books and Records (at least in their redacted form) do not reveal any examination of the performance or effectiveness of the program. (*Id.*)

The Ad Hoc Committee met again on April 9, 2018, when management revealed that, due to "system errors," 9,409 suspicious orders dating back to 2012 had not been reported. (*Id.*, ¶ 203.) The full Board was informed of the unreported suspicious orders two days later. (*Id.*) According to Plaintiffs, the Books and Records show that no member of the Board "questioned any aspect of management's 'investigation and analysis' or . . . asked how these 'system errors' could . . . have existed since 2012" in light of the reported enhancements to the compliance program. (*Id.*, ¶ 205.) On April 25, 2018, Cardinal Health disclosed to House Energy and Commerce Committee investigators that 14,131 suspicious orders had gone unreported since 2012. (*Id.*)

Mr. Barrett testified before the House Energy and Commerce Committee on May 8, 2018. (*Id.*, ¶ 206.) The Ad Hoc Committee met that same day and again discussed the unreported suspicious orders. (*Id.*, ¶ 207.) The Ad Hoc Committee next convened on June 4, 2018, when they learned that Cardinal Health had received a request for information from the DEA, that "as a part of continuous enhancement of Cardinal Health's anti-diversion and regulatory reporting functions, a cross-functional team will review related business, EIT, and audit

23

processes," and that management had formed a Steering Committee to lead the effort. (*Id.*, ¶ 208.)

On July 12, 2018, Senator McCaskill's report (the "McCaskill Report") was published. (*Id.*, ¶ 209.) The McCaskill Report alleged that Cardinal Health and its peers had "consistently failed to meet their reporting obligations over the [preceding] ten years." (*Id.*, ¶ 210.) The McCaskill Report found "ongoing problems" with suspicious order reporting, and a dearth of information on Cardinal Health's customer diligence process. (*Id.*) Further, the McCaskill Report alleges that Cardinal Health actually reported to the DEA only one-fifth of the suspicious orders it told Congress it had reported. (*Id.*)

The House Energy and Commerce Committee's report (the "Energy and Commerce Report") followed in December. (*Id.*, ¶ 213.) The Energy and Commerce Report also found compliance deficiencies. For example, the two-person review process required as part of the 2012 Settlement was not reflected in Cardinal Health's written policies until 2016, and the company's documentation supporting increases in suspicious order thresholds was often incomplete or inconsistent. (*Id.*, ¶¶ 214, 215.)

In the intervening months, the Board had received updates on the McCaskill Report, the unreported suspicious orders matter, the company's anti-diversion program, and the work of the Steering Committee. (*Id.*, ¶¶ 211, 212.) The Ad Hoc Committee was briefed on the Energy and Commerce Report the day it was published. (*Id.*, ¶ 217.) The Ad Hoc Committee later noted management's

"observations" on the Energy and Commerce Report and "directed management to continue its approach regarding the anti-diversion program continual improvement process." (*Id.*, ¶ 218.)

### C.    Procedural Background

Ms. Cohen's original complaint was filed on June 14, 2019 (ECF No. 1), followed by Mr. Anderson's on December 13, 2019 (2:19-cv-5442, ECF No. 1), and Mr. Splaine's on January 13, 2020 (2:20-cv-203, ECF No. 1). The three cases were consolidated on January 28, 2020, under the caption *In re Cardinal Health, Inc. Derivative Litigation.* (ECF No. 31.)

The Consolidated Complaint, filed on March 12, 2020 (ECF No. 35), alleges that the Individual Defendants breached their fiduciary duties by failing to exercise oversight over the company's CSA compliance (Count I) and committed corporate waste (Count II). (Consol. Compl., ¶¶ 248–59.) Defendants' Motion to Dismiss then followed. (ECF No. 43.) Defendants argue that Plaintiffs' Consolidated Complaint must be dismissed for failure to state a claim under Rule 12(b)(6) owing to Plaintiffs' failure to comply with the pre-suit demand requirements set forth in Rule 23.1. (*See generally* Mot. to Dismiss.)

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 8(a) requires a plaintiff to plead each claim with sufficient specificity to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotations omitted). A complaint which falls short of the Rule 8(a) standard may be dismissed if it fails to state a claim upon which relief can be

granted. Fed. R. Civ. P. 12(b)(6).

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations and quotations omitted). The complaint need not contain detailed factual allegations, but it must include more than labels, conclusions, and formulaic recitations of the elements of a cause of action. *Directv, Inc. v. Treesh*, 487 F.3d, 471, 476 (6th Cir. 2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678 (citing *Twombly,* 550 U.S. at 555).

A shareholder derivative action must also satisfy the heightened pleading standard set forth in Rule 23.1(b)(3), which requires a complaint to "state with particularity: (A) any effort by the plaintiff to obtain the desired action from the directors . . . ; and (B) the reasons for not obtaining the action or not making the effort." Fed. R. Civ. P. 23.1(b)(3). This standard "differs substantially" from ordinary notice pleading. *See McCall v. Scott*, 239 F.3d 808, 815 (6th Cir. 2001) (quoting *Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000)) *amended on denial of rehearing*, 250 F.3d 997 (6th Cir. 2001). "If [p]laintiffs do not comply with the requirements of

26

Rule 23.1, they do not have standing to bring suit." *In re Ferro Corp. Derivative Litig. ("Ferro II")*, 511 F.3d 611, 617 (6th Cir. 2008).

## III.  ANALYSIS

Defendants argue that Plaintiffs lack standing to bring their derivative action because they failed to make a pre-suit demand on the Board, and the Consolidated Complaint does not state with particularity that demand was excused. (Mot. to Dismiss, 8.) When derivative claims are brought under federal law, courts look to the law of the state of incorporation—here, Ohio—to determine whether pre-suit demand is excused. *See McCall*, 239 F.3d at 815. The Ohio Rules of Civil Procedure also require a complaining shareholder to allege with particularity its efforts to obtain the desired action from the board or its reasons for failing to do so. Ohio Civ. R. 23.1. Under Ohio law, "[t]he board of directors has the primary authority to file a lawsuit on behalf of the corporation." *Drage v. Procter & Gamble*, 694 N.E.2d 479, 482 (Ohio Ct. App. 1997). *See also* Ohio Rev. Code § 1701.59(A). Although a shareholder may demand that the board bring suit on behalf of the corporation, "no shareholder has an independent right to bring suit *unless* the board refuses to do so *and* that refusal in wrongful, fraudulent, or arbitrary, or is the result of bad faith or bias on the part of the directors." *Drage*, 694 N.E.2d at 482 (emphasis added).

Failure to make a pre-suit demand is excusable, however, when a plaintiff can demonstrate that demand would have been futile. *Id*. "Futility means that the directors' minds are closed to argument and that they cannot properly exercise their business judgment in determining whether the suit should be filed. It is not enough

to show that the directors simply disagree with a shareholder about filing a suit." *Id.*, 694 N.E.2d at 482–83. "Establishing demand futility under Ohio law 'is not an easy task.'" *In re Keithley Instruments, Inc. Derivative Litig.*, 599 F. Supp. 2d 875, 889 (N.D. Ohio 2008) (quoting *In re Ferro Corp. Derivative Litig. ("Ferro I")*, No. 1:04-cv-1626, 2006 WL 2038659, at *5 (N.D. Ohio Mar. 21, 2006)). "Ohio law presumes that any action taken by a director on behalf of the corporation is taken in good faith and for the benefit of the corporation." *Davis v. DCB Fin. Corp.*, 259 F. Supp. 2d 664, 670 (S.D. Ohio 2003). So, to allege futility with particularity, "the plaintiff must point to facts which show that the presumed ability of the directors to make unbiased, independent business judgments about whether it would be in the corporation's best interests to file the action does not exist in [the particular] case." *Id.* Said another way, "a plaintiff must plead facts creating a reasonable doubt that a majority of the board of directors is capable of making a disinterested and independent decision about whether to initiate litigation." *In re Gas Nat., Inc.*, No. 1:13-cv-2805, 2015 WL 3557207, at *7 (N.D. Ohio June 4, 2015) (citing *Keithley*, 599 F. Supp. 2d at 890). *See also McCall*, 239 F.3d at 816 (applying the similar *Rales* test, under Delaware law, to determine whether demand is excused for fiduciary duty claims arising out of board inaction).[7]

Plaintiffs here allege that, through the more than ten-year period covered in the Consolidated Complaint, "the Books and Records paint a consistent picture of

---

[7] "Ohio courts routinely look to Delaware case law for guidance in deciding corporate law issues generally, and demand futility issues specifically." *Keithley*, 599 F. Supp. 2d at 888 n. 10 (citing *Drage*, 694 N.E.2d 479).

the Board's passive receipt of information rather than the directors' active engagement, questioning and monitoring of the effectiveness of the Company's anti-diversion controls." (Consol. Compl., ¶ 117.) In other words, Plaintiffs challenge the Board's _in_action in response to red flags they allege should have spurred _affirmative_ action in overseeing management and the CSA compliance program. In cases like this one, which allege board inaction and failure of oversight, a board is considered incapable of making a disinterested and independent decision about whether to initiate litigation—and demand, therefore, considered futile—"only if the 'particularized allegations of the complaint present a substantial likelihood of liability' for a majority of the board, and not simply the 'mere threat of personal liability.'" *Stanley v. Arnold ("Stanley I")*, No. 12-cv-482, 2012 WL 5269147, at *5 (S.D. Ohio Oct. 23, 2012) (Black, J.) (quoting *Keithley*, 599 F. Supp. 2d at 890 (internal quotation marks omitted)) *aff'd Stanley v. Arnold ("Stanley II")*, 531 F. App'x 695 (6th Cir. 2013). Directors of an Ohio corporation face personal liability only if shown by clear and convincing evidence that they acted with reckless disregard for the corporation's best interest, or with deliberate intent to cause injury to the corporation. Ohio Rev. Code § 1701.59(E). In failure of oversight cases, liability hinges on whether the directors "ignore 'red flags' that actually come to their attention, warning of compliance problems." *Forsythe v. ESC Fund Mgmt. Co. (U.S.), Inc.*, 2007 WL 2982247, at *7 (Del. Ch. Oct. 9, 2007) (citing *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006)).

Demand futility is determined as of the date an action was first filed. *See Ferro II*, 511 F.3d at 621. As of the filing of this case, the Board consisted of Ms. Arnold, Ms. Cox, Mr. Darden, Mr. Downey, Ms. Hemingway Hall, Mr. Johri, Mr. Kaufmann, Mr. Kenny, Ms. Killefer, and Mr. Losh (together, the "Demand Board"). (Consol. Compl., ¶ 240.) The Court must, therefore, determine whether the Consolidated Complaint alleges particularized facts that present a substantial likelihood of liability as to five or more members of the Demand Board.

**A.    The Consolidated Complaint sufficiently alleges demand futility as to Count I.**

**1.    The Consolidated Complaint plausibly alleges that Arnold, Cox, Darden, Downey, and Kenney (the Demand Board members who were on the Board at the time of the 2012 Settlement) acted with reckless disregard for the corporation's best interest by failing to take action on CSA compliance.**

Plaintiffs maintain that the Consolidated Complaint contains sufficient particularized factual allegations, drawn from the Books and Records, to plausibly establish that the Individual Defendants had actual knowledge that Cardinal Health was operating with deficient CSA compliance programs and recklessly failed to exercise oversight or question management's representations. In some cases, courts perform a director-by-director analysis to determine whether a majority of the board is alleged to be sufficiently disinterested to consider a litigation demand in good faith. However, courts have discretion to perform that analysis in the manner best suited to the unique facts of the case at hand. *See In re Pfizer Inc. S'holder Derivative Litig.*, 722 F. Supp. 2d 453, 461 (S.D.N.Y. 2010) (citing *Grobow*

30

*v. Perot*, 539 A.2d 180, 190 (Del. 1988) *overruled on other grounds by Brehm*, 746 A.2d 244). Here, a director-by-director analysis is not necessary.

The first red flag is, undoubtedly, the 2008 Settlement. At that point, the Board[8] was on notice that CSA noncompliance could pose an existential threat to Cardinal Health's core business. The DEA had suspended the registration of four Cardinal Health distribution facilities, and greenlit operations only after the company agreed to make changes to its compliance programs—including sending suspicious orders directly to DEA headquarters, improving processes for suspicious order threshold setting, and conducting increased customer due diligence—and paid an impressive $34 million in penalties. So, three years later, when Mr. Morford presented with celebration that flagged events had _decreased_ and _fewer_ customers were blocked from purchasing controlled substances, the Board[9] should have questioned whether those results were truly indicative of compliance with the 2008 Settlement. As it turns out, they were not.

The day after Mr. Morford's October 25, 2011 presentation, a DEA warrant was issued to inspect the Lakeland facility. The resulting 2012 Settlement underscored the importance of CSA compliance to Cardinal Health's Pharmaceutical segment by suspending operations at the Lakeland facility for two

---

[8] As of the 2008 Settlement, the Board included Ms. Arnold, Mr. Darden, Mr. Kenny, and Mr. Losh.

[9] As of the October 2011 presentation, the Board included Ms. Arnold, Ms. Cox, Mr. Darden, Mr. Downey, and Mr. Kenny.

years. It should have also signaled to the Board[10] that management needed additional support, or oversight, to ensure CSA compliance within Cardinal Health. The 2012 Settlement stated in black-and-white that Cardinal Health had not done what it needed to do after the 2008 Settlement, and demanded even more stringent compliance program enhancements in familiar areas like suspicious order threshold setting and customer due diligence. Still, the Board remained passive when it came to CSA compliance.

At the February 2017 meeting, the Board[11] was briefed on the chaotic final weeks of 2016, in which Cardinal Health agreed to pay a total of $64 million to settle investigations with four United States Attorneys' Offices and a lawsuit from the State of West Virginia, on top of being featured in headline exposés. The news was met with more silence from the Board: not a single member pressed management to ensure that noncompliance was a thing of the past, or that the compliance program was operating as the law would intend it.

Soon, both chambers of the United States Congress took an interest in Cardinal Health. But the Books and Records reveal that compliance updates dove no deeper into the effectiveness and efficient operation of the CSA compliance program—and the Board did not demand otherwise. Revelations the following year

---

[10] As of the 2012 Settlement, the Board included Ms. Arnold, Ms. Cox, Mr. Darden, Mr. Downey, and Mr. Kenny.

[11] As of the February 2017 meeting, the Board included Ms. Arnold, Ms. Cox, Mr. Darden, Mr. Downey, Mr. Hemingway Hall, Mr. Kenny, and Ms. Killefer.

made clear to everyone, including the Board,[12] that CSA compliance remained a weakness at Cardinal Health: many thousands of suspicious orders had gone unreported for years; customer due diligence processes were not well-documented; and suspicious order threshold setting was inconsistently administered.[13]

The Consolidated Complaint plausibly alleges a substantial likelihood of liability on Count I as to Ms. Arnold, Ms. Cox, Mr. Darden, Mr. Downey, and Mr. Kenny.[14] "[T]he magnitude and duration of the alleged wrongdoing is relevant in determining whether the failure of the directors to act constitutes a lack of good faith." *McCall*, 239 F.3d at 823. These Individual Defendants were on the Board at the time of the 2012 Settlement and should have been particularly hawkish about ensuring that Cardinal Health's CSA compliance program was fulsome and effective. *Cf. Pfizer*, 722 F. Supp. 2d at 455 (noting the appropriate impact of prior settlements on a company's sensitivity to regulatory compliance). Further, they should have confronted management reports with robust skepticism, after their representations about compliance with the 2008 Settlement were discovered to be inaccurate. *Cf. In re McKesson Corp. Derivative Litig.*, No. 17-cv-01850-CW, 2018 WL 2197548, at *9 (N.D. Cal. May 14, 2018). *See also* Ohio Rev. Code

---

[12] With the exception of Mr. Losh, who rejoined the Board in December 2018, the entire Demand Board was seated at the time the unreported suspicious orders were made known and the two congressional reports published.

[13] As opposed to constituting red flags themselves (at least in this instance), these 2018 revelations serve as evidence that previous red flags were ignored.

[14] This finding is dispositive, in light of their number. Although there may be other Individual Defendants who are not sufficiently disinterested to consider a pre-suit demand for the same or other reasons (*e.g.*, Mr. Kaufmann by virtue of his employment by Cardinal Health), the Court need not and does not address them.

§ 1701.59(D)(2). Their failure to engage on the issue of CSA compliance, while receiving regular and clear indications that the problem persisted, supports an inference that these Individual Defendants acted, at the least, with reckless disregard for Cardinal Health's best interests.

### 2. Defendants' arguments in opposition are unavailing.

Defendants offer several arguments in support of their position that Plaintiffs failed to satisfy their heightened pleading standard. (*See generally*, Mot. to Dismiss.) First, Defendants argue that issue preclusion prevents this Court from finding that the Individual Defendants who were also defendants in two 2012 shareholder derivative complaints face a substantial likelihood of liability for conduct discussed in those suits. (*Id*., 9.) Second, Defendants argue that Plaintiffs' claims are time-barred with respect to any act or omission before June 14, 2015, which includes all conduct underlying the 2008, 2012, and 2016 Settlements with the DEA. (*Id*., 11.) Third, Defendants argue that the Consolidated Complaint fails because it does not allege that the Individual Defendants gained any personal advantage from the alleged wrongdoing or had actual knowledge of any red flags, and because it advances allegations against the Individual Defendants as a group, as opposed to identifying their individual roles in the alleged wrongdoing. (*Id*., 12.) Fourth and finally, Defendants argue that the allegations in fact show that the Individual Defendants fulfilled their fiduciary duties.[15] (Reply, 8.) Each of these arguments is unavailing.

---

[15] Although this argument is presented as an extension of the third, the Court will address it separately.

34

### a.    Defendants' issue preclusion argument is meritless.

Defendants first argue that, to the extent Count I seeks to hold the

Individual Defendants liable for the 2008 and 2012 Settlements, issue preclusion

estops Plaintiffs from their pursuit. The Sixth Circuit has explained:

> Issue preclusion, often referred to as collateral estoppel, "precludes
> relitigation of issues of fact or law actually litigated and decided in a
> prior action between the same parties and necessary to the judgment,
> even if decided as part of a different claim or cause of action." *Gargallo
> v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 918 F.2d 658, 661 (6th
> Cir. 1990). Four requirements must be met before issue preclusion
> applies:
>
> > (1) the precise issue must have been raised and actually
> > litigated in the prior proceedings; (2) the determination of
> > the issue must have been necessary to the outcome of the
> > prior proceedings; (3) the prior proceedings must have
> > resulted in a final judgment on the merits; and (4) the party
> > against whom estoppel is sought must have had a full and
> > fair opportunity to litigate the issue in the prior
> > proceeding.
>
> *Cobbins v. Tenn. Dep't of Transp.*, 566 F.3d 582, 589–90 (6th Cir. 2009)
> (citing *N.A.A.C.P., Detroit Branch v. Detroit Police Officers Ass'n*, 821
> F.2d 328, 330 (6th Cir. 1987)).

*Georgia-Pacific Consumer Prods. LP v. Four-U-Packaging, Inc.*, 701 F.3d 1093, 1098

(6th Cir. 2012) (internal footnote omitted).

Defendants' issue preclusion argument centers around two decisions in

shareholder derivative complaints, brought after the 2012 Settlement, seeking to

hold certain Cardinal Health directors and officers liable for breaches of their

fiduciary duties: this Court's decision in *Stanley I*, 2012 WL 5269147; and the

Delaware County Court of Common Pleas decision in *Himmel v. Barrett*, No.

12CVA060663, 2013 WL 4719080 (Ohio Ct. Com. Pl. July 9, 2013). Both courts held

that the plaintiffs failed to adequately allege demand futility. *Himmel*, 2013 WL 4719080, at \*5 (finding that the plaintiff's allegations were not sufficiently particular and therefore failed to both "state a claim for demand excusal" and "satisfy the requirements of Ohio Rule of Civil Procedure 23.1"); *Stanley I*, 2012 WL 5269147, at \*7 ("In considering the totality of the circumstances, Plaintiff has failed to state adequately that making a demand on the Board was futile, and Plaintiff has failed to state adequately that half the Board is substantially likely to be personally liable."); *see also Stanley II*, at 696 ("The district court dismissed his verified complaint for lack of standing under Federal Rule of Civil Procedures 23.1 due to his failure to 'state with particularity' the reasons for failing to make a pre-suit demand of Cardinal's board of directors."). While this Court has misgivings[16] about extending these decisions (which assess the adequacy of the pleadings *filed in those cases*) to preclude Plaintiffs from arguing that their own Consolidated Complaint adequately alleges demand futility, Defendants cite case law indicating that they may. *See Nathan v. Rowan*, 651 F.2d 1223 (6th Cir. 1981); *Arduini v. Hart*, 774 F.3d 622 (9th Cir. 2014); *In re Sonus Networks, Inc. S'holder Derivative Litig.*, 499 F.3d 47 (1st Cir. 2007); *Cal. State Teachers' Ret. Sys. v. Alvarez*, 179 A.3d

---

[16] In *In re Wal-Mart Stores, Inc. Del. Derivative Litig.*, the Chancery Court explained that issue preclusion in demand futility cases, in combination with the "fast-filer" phenomenon—"where counsel handling cases on a contingent basis have significant financial incentive to race to the courthouse in an effort to beat out their competition and seize control of a case, often at the expense of undertaking adequate due diligence [i.e., a books and records request]"—can rob subsequent shareholders of the opportunity to file well-investigated derivative complaints. 167 A.3d 513 (Del. Ch. 2017). The Chancery Court went on to propose that issue preclusion should not bar subsequent attempts to plead demand futility after a Rule 23.1 dismissal. The proposal was rejected by the Delaware Supreme Court in *Alvarez*, 179 A.3d 824 (Del. 2018). Nonetheless, this Court agrees with Chancellor Bouchard that the law as it stands can lead to "troubling" and unjust results.

824 (Del. 2018). However, the Consolidated Complaint in this case includes seven additional years of allegations that occurred after the *Stanley* and *Himmel* complaints. Although the 2008 and 2012 Settlements of course have not changed, the events of intervening years illuminate the fact and consequence of the Board's inadequate response to those settlements. In other words, the 2012 Settlement is now a red flag whereas, in *Stanley* and *Himmel*, it principally evidenced the alleged breach and damages resulting therefrom. As a result, this Court's determination of demand futility hinges on the Board's failure to act after the 2012 Settlement—and after the *Stanley* and *Himmel* cases were filed. *See* III.A.1., *supra*. Accordingly, the *Stanley I* and *Himmel* decisions cannot be said to decide the precise issue now before the Court—*i.e.*, whether a majority of the Demand Board could have considered a pre-suit demand in good faith.

**b.** **Plaintiffs' claims for recovery are not clearly time-barred.**

Next, Defendants argue that a four-year statute of limitations applies (*see* Ohio Rev. Code § 2305.09), and bars recovery against the Individual Defendants for any action or inaction before June 19, 2015—including all conduct covered by the 2008, 2018, and 2016 Settlements with the DEA. As a result, Defendants reason that Plaintiffs cannot satisfy their burden to show a substantial likelihood of personal liability against the Individual Defendants and, therefore, demand failure is not excused. The Court does not disagree with the logic. *See Keithley*, 599 F. Supp. 2d at 901 ("If, as a matter of law, based on the running of the applicable statute of limitation or repose, the individual [director] faced no possibility of

37

liability because any claims against the individual were time-barred, then surely the individual cannot be said to face a 'substantial likelihood' of liability."). However, it is far from apparent that *any and all* alleged failures to act fall outside the limitations period. The Consolidated Complaint may well establish breaches occurring within the limitations period. For example, the West Virginia Attorney General's August 2015 amended complaint, the 2016 Washington Post and West Virginia Gazette-Mail articles, the mountain of unreported suspicious orders discovered in 2018, and the McCaskill and House Energy and Commerce Committee Reports are all alleged to indicate continued, large-scale compliance failures by Cardinal Health. The Court declines to "parse" Plaintiffs' claim any further at this stage. *See Cataldo, U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012).

Plaintiffs suggest that the continuing violations doctrine may toll the statute of limitations in this action. (Mem. in Opp'n, 19 (citing *In re Nat'l Prescription Opiate Litig.*, No. 1:17-md-2804, 2019 WL 41924296, at *13 (N.D. Ohio Sept. 4, 2019) (declining to reject invocation of continuing violations doctrine at summary judgment stage when plaintiffs maintain that the injury was caused by a "decades-long . . . scheme").) The Court disagrees. Plaintiffs allege a series of similar violations occurring over many years, but have not sufficiently alleged that a "longstanding and demonstrable policy" drove those violations. *See Wigington v. Metro. Nashville Airport Auth.*, 374 F.Supp.3d 681, 692–93 (M.D. Tenn. Mar. 20, 2019) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002)). Nevertheless, the pre-limitations period allegations are relevant to the extent that

they show Individual Defendants' knowledge of: the red flags that arose over the years; the compliance program's continued and ongoing failure to prevent familiar red flags from resurrecting; and the significant potential cost to Cardinal Health and its business for continued CSA compliance violations. *See Lebanon Cty. Employees' Ret. Fund v. AmerisourceBergen Corp.*, C.A. No. 2019-0527-JTL, 2020 WL 132752 (Del. Ch. Jan. 13, 2020) (listing possible permissible uses of information outside of the statute of limitations in shareholder derivative actions).

> **c.    The Consolidated Complaint sufficiently alleges specific facts showing that the Individual Defendants had actual knowledge of red flags.**

Defendants next take aim at the sufficiency of the factual allegations in the Consolidated Complaint. They argue that the Consolidated Complaint neither alleges that the Individual Defendants had actual knowledge of any red flags nor that the Individual Defendants had anything to gain by engaging in the alleged wrongdoing, and that the Consolidated Complaint improperly 'lumps together' all of the Individual Defendants, as opposed to offering individualized allegations.

As to the first contention, the Consolidated Complaint indeed alleges specific facts showing that the Individual Defendants had actual knowledge of red flags related to CSA compliance. The allegations reference no fewer than 53 specific instances in which the Board or one of its relevant committees met to discuss, or was otherwise notified of important information related to, compliance risks or issues in Cardinal Health's distribution of prescription opioids. (Consol. Compl., ¶¶ 93, 95, 96, 98, 99, 102, 105, 106, 108, 113, 115, 118–20, 128, 130–32, 151, 159, 160, 162–65, 167–71, 180, 182, 184, 189, 192, 193, 196, 197, 199, 202, 203, 209, 211,

212, 217–19.) Unlike the complaint filed in *Stanley*, the allegations here are specific and supported by Cardinal Health's Books and Records. *See Stanley I*, 2012 WL 5269147, at *6. *See also* Mot. to Dismiss Ex. 5. Ranging from the October 12, 2007 report to the Audit Committee (then staffed by Mr. Kenny) on the Stafford warrant, to the October 25, 2011 Morford memo to the Board (which then included Ms. Arnold, Mr. Barrett, Ms. Cox, Mr. Darden, Mr. Downey, Mr. Kenny, and Mr. King) trumpeting the compliance program enhancements' success at <u>*reducing*</u> flagged events and blocked suspicious orders, to the August 5, 2016 meeting at which the Board (which then included Mr. Anderson, Ms. Arnold, Mr. Barrett, Ms. Cox, Mr. Darden, Mr. Downey, Ms. Hemingway Hall, Mr. Jones, Mr. Kenny, Ms. Killefer, and Mr. King) received annual compliance reports and presentations from Mr. Morford and Senior Vice President of Ethics and Compliance Hollie Foust, to the November 4, 2016 investor relations packets distributed to the Board (same composition as August 5, 2016) containing the spotlight reporting from the Washington Post on the role of distributors in the opioid crisis, the Consolidated Complaint alleges specific facts which, accepted as true, make abundantly clear that the Individual Defendants had actual knowledge of red flags related to Cardinal Health's CSA compliance.

Defendants also argue that the Consolidated Complaint fails to rebut the "heightened" presumption that outside directors of an Ohio corporation can consider a pre-suit demand in good faith. Here, Defendants over-read the law. It is true that this Court stated in *Stanley I*:

> [B]ecause the vast majority of the current Board (eleven of twelve) is composed of outside directors, there is a heightened presumption that the Board could have considered a demand in good faith.

2012 WL 5269147, at *7.[17] However, the presumption that attaches under Ohio law is singular: A director is presumed capable of "mak[ing] an unbiased, independent business judgment about whether it would be in the corporation's best interests to sue some or all of the other directors." *Drage*, 694 N.E.2d at 483. The *Stanley I* Court simply pointed out that a common factor that strikes against the presumption of independence (employment) did not apply in that case.

Defendants go on to make hay of the Consolidated Complaint's silence with respect to the Individual Defendants' "motive to act or fail to act" in violation of their fiduciary duties. (Mot. to Dismiss, 13.) They cite *Davis*, in which this Court noted—in a laundry list of reasons why that plaintiff failed to plead demand

---

[17] Although the *Stanley I* Court cites "*Drage*, 694 N.E.2d at *2" as "recognizing [a] heightened presumption that a board acted in good faith where a majority of [the] board consists of outside directors[,]" that citation appears to be in error. Neither does the case contain a page *2, nor does it stand for the cited proposition. The *Himmel* Court cites to a "*Drage*, 49 Ohio St. 3d 604" in support of the same notion that a "heightened presumption" that the board could have independently considered a pre-suit demand applies when the board has a majority of outside directors. But this citation also appears to be in error. Stating simply "This appeal is dismissed, *sua sponte*, as having been improvidently allowed[,]" the cited decision cannot possibly support the assertion. Apparently recognizing the confusion, Defendants themselves do not cite *Drage* as support. (*See* Mot. to Dismiss, 13.)

It is possible, though far from clear, that both cases intended to reference the 1988 opinion in *Drage v. Ameritrust Corp.* There, an Ohio appeals court considering the propriety of a board-approved stock buyback, cites Delaware law recognizing that the business judgment rule's presumption of good faith is bolstered when a majority of the board is made up of outside directors. No. 55772, 1988 WL 113631, at *2 (Ohio Ct. App. Sept. 29, 1988) (citing *Moran v. Household Int'l, Inc.*, 500 A.2d 1346, 1356 (Del. 1985)). *See also In re FedEx Corp. S'holder Derivative Litig.*, Case Nos. 08-2284 and 08-2369, 2009 WL 10700362, at *12 (W.D. Tenn. July 30, 2009) (citing *Grobow*, 539 A.2d at 190). Delaware law on demand futility expressly incorporates its business judgment rule. *See Drage v. Procter & Gamble*, 694 N.E.2d 479, 486 (Ohio Ct. App. 1997) (citing *Grobow*, 539 A.2d at 186). Nonetheless, "Ohio has not expressly adopted the test used by the Delaware courts in determining whether demand is excused based on allegations that the directors failed to exercise proper business judgment." *Id.*

futility—that the complaint "does not allege that any of the directors gained any personal advantage from the [alleged wrongdoing] or had some other self-serving bias against any challenge to [the wrongdoing]." 259 F. Supp. 2d at 671. However, Plaintiffs rightly note in response that they have no obligation to allege a motive. *See In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 66–67 (Del. 2006) (noting, in discussion of duty of good faith, that cases of fiduciary misconduct "have arisen when corporate directors have no conflicting self-interest in a decision, yet engage in misconduct that is more culpable than simple inattention or failure to be informed of all facts material to the decision"). *Cf. In re Cardinal Health Inc. Securities Litig.*, 426 F. Supp. 2d 688, 726 (S.D. Ohio 2006) (Marbley, C.J.) (noting in context of securities fraud claim that "motive and opportunity are not substitutes for a showing of recklessness") (quoting *PR Diamonds, Inc. v. Chandler*, 91 F. App'x 418, 434 (6th Cir. 2004)). *Davis* itself indicates that an allegation of personal pecuniary gain or self-interest is but one of many possible components of a sufficient complaint.[18] Defendants' argument otherwise is not persuasive.

---

[18] The full paragraph in which Defendants' citation appears is illuminating:

Plaintiff has also failed to allege facts showing that [] demand would be futile. He alleges that the action cannot be prosecuted by the directors "because they have participated in, caused and acquiesced in the wrongs alleged herein" and that a demand to file suit would thus require the directors to sue themselves. He also alleges that the directors "are adversely interested and involved in the deliberate concealment of financial data as alleged herein." However, the complaint contains only broad, conclusory allegations of misrepresentation, breach of fiduciary duty, and failure to follow proper accounting procedures against the directors as a group. He alleges no facts, beyond pure speculation, as to what items were included in the write down. He does not identify what role, if any, that the individual board members had in the write down. He does not allege facts showing that all of the board members were involved in the alleged misconduct, so that none of them would be capable of acting independently on behalf of the corporation. He does not allege that any of the directors gained any personal advantage from the write down or had some other self-serving bias against

The Court also finds no error in the Consolidated Complaint's reference to the Individual Defendants as a group, as opposed to individually. Defendants note that the Court in *Stanley I* remarked that complaint failed in part because it "lump[ed] together the directors instead of directing specific allegations at specific individuals." 2012 WL 5269147, at *7. However, as already established, the complaint in *Stanley I* was not supported by the Books and Records and was, therefore, unsurprisingly vague in this regard. But, when read as a whole, the Consolidated Complaint in this case specifically alleges which of the Individual Defendants received notice of red flags, which are implicated in alleged failures to act, and at which points in time. Plaintiffs are not required to encumber their pleading by reciting the names of each Individual Defendant who comprised the Board or any committee at the time period relevant to each paragraph. *Cf. Pfizer*, 722 F. Supp. 2d at 461 (citing *Grobow*, 539 A.2d at 186). Their summary of the Individual Defendants' Board service, in combination with the allegations drawn from the Books and Records that the Board or a committee received information and collectively failed to act or ask questions in response, is sufficient.

> **d.     The Court cannot infer that the Individual Defendants properly responded to red flags.**

Finally, Defendants argue that the Consolidated Complaint's factual allegations do not show that the Board engaged in wrongful inaction, but instead

---

any challenge to the write down. The facts contained in plaintiff's complaint are insufficient to establish that all of the directors of DCB are incapable of exercising an independent and unbiased business decision on whether to challenge any aspects of the write down in court.

*Davis*, 259 F. Supp. 2d at 671 (citations to the record omitted).

"show that the [Board] responded to 'red flags' when presented." (Reply, 8.) The evidence may bear out that the Individual Defendants acted in accordance with their fiduciary duties, but all reasonable inferences must be drawn in favor of Plaintiffs at this stage in the litigation. *See Gavitt*, 835 F.3d at 640. And the allegations in the Consolidated Complaint lend themselves as easily to the inference that the Board failed to act in the face of red flags, as any otherwise. *See McCall*, 239 F.3d at 821 (reversing district court's conclusion that "one could reasonably expect" hospital system's billing to be higher than average due to its size, instead of improper billing practices, as failure to draw reasonable inference in favor of plaintiffs). *See also Shaev v. Baker*, No. 16-cv-5541-JST, 2017 WL 1735573, at *14 (N.D. Cal. May 4, 2017) (rejecting defendants' argument that reports to the board of misdeeds by employees across the company led it to believe oversight controls were performing as intended as a "hypothetical explanation for their conduct" not entitled to judicial inference on motion to dismiss) (internal citations omitted).

### B. The Consolidated Complaint fails to establish a reasonable doubt as to the disinterestedness of a majority of the Demand Board with respect to Count II.

Count II of the Consolidated Complaint alleges that the Individual Defendants engaged in waste of corporate assets by paying excessive compensation to executives during a period of repeated compliance failures.[19] "[U]nder Ohio law, corporate waste . . . [is one way] in which fiduciary duty can be breached, not [a]

---

[19] The Consolidated Complaint also alleges that the Individual Defendants' failure to curb compliance violations that resulted in substantial fines, litigation liability, and attorney fees constituted waste. However, in light of Ohio law's treatment of corporate waste as a breach of fiduciary duty, that claim is duplicative of the injury alleged in Count I.

separate cause[] of action independent of a fiduciary breach." *Keithley*, 599 F. Supp. 2d at 903 (citing *Prodan v. Hemeyer*, 610 N.E.2d 600 (Ohio Ct. App. 1992)). Therefore, Plaintiffs must again show demand futility by alleging particularized facts presenting a substantial likelihood that a majority of the Demand Board acted in reckless disregard for the best interest of the company, or with the deliberate intent to cause injury to it—this time, in approving executive compensation. *Id*.

Numbers have a way of transforming a complex issue into one that can be felt and grasped. It is certainly thought-provoking to see the numbers representing Cardinal Health executives' compensation in such close proximity to those representing the lives and livelihoods lost to opiate addiction. (*See* Consol. Compl., ¶¶ 25, 32, 55–59.) Nevertheless, Plaintiffs have failed to allege specific facts showing that a majority of the Demand Board faces a substantial likelihood of liability for approving improper or excessive compensation. Aside from noting that Ms. Arnold, Ms. Cox, Mr. Darden, Ms. Hemingway Hall, Mr. Jones, Mr. Kenny, Ms. Killefer, and Mr. King have each served on the Compensation Committee at some point since 2008, the Consolidated Complaint is void of detail about Compensation Committee meetings and discussions, compensation plans, performance metrics and targets, market data, or even annual rates and changes in compensation. That some of the Individual Defendants were members of the committee tasked with approving officers' compensation during periods of CSA non-compliance, alone, is insufficient. *See Monday v. Meyer*, No. 1:10-cv-1838, 2011 WL 5974664, at *7 (N.D. Ohio Nov. 29, 2011) ("Courts repeatedly reject allegations of membership on committees, and

45

recitation of the roles of the committees, as establishing a likelihood of liability."). Plaintiffs have failed to plead demand futility, and Defendants' Motion to Dismiss Count II is **GRANTED**.

## IV.     CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss is **DENIED** as to Count I and **GRANTED** as to Count II.


**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**