**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| IN RE CARDINAL HEALTH, INC. DERIVATIVE LITIGATION | Case No. 2:19-cv-2491 |
| | JUDGE SARAH D. MORRISON |
| | Magistrate Judge Elizabeth A. Preston Deavers |

**JOINT DECLARATION OF ERIC L. ZAGAR AND JENNIFER SARNELLI
IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF
DERIVATIVE SETTLEMENT AND APPLICATION FOR AN
AWARD OF ATTORNEYS' FEES AND EXPENSES**

We, Eric L. Zagar and Jennifer Sarnelli, jointly declare as follows under 28 U.S.C. § 1746:

1.     We, Eric L. Zagar and Jennifer Sarnelli, are partners of Kessler Topaz Meltzer & Check, LLP ("KTMC") and Gardy & Notis, LLP ("G&N"), respectively, and serve as Co-Lead Counsel for Plaintiffs Michael Splaine ("Splaine"), Stanley Malone ("Malone"), and Melissa Cohen ("Cohen") (collectively, "Plaintiffs") in the above-captioned action (the "Action").  We have personal knowledge of the facts set forth in this declaration.  If called upon to do so, we could and would competently testify to such facts.

2.     We respectfully submit this declaration in support of Plaintiffs' Motion for Final Approval of Settlement and Motion for an Award of Attorneys' Fees and Expenses in the Action.

**I.     PRELIMINARY STATEMENT**

3.     Plaintiffs are longstanding stockholders of Cardinal Health, Inc. ("Cardinal Health" or the "Company") and brought this stockholder derivative action to hold responsible certain current and former members of the Company's board of directors (the "Board") for failing to properly oversee Cardinal Health's compliance with the laws regulating the distribution of opioids. As a result, Plaintiffs allege, the Company was able to devise systems to evade regulators and sell

pills rather than ensuring these highly addictive medications were provided to legal recipients. Plaintiffs allege since 2008, the Individual Defendants,[1] in reckless disregard for the best interests of Cardinal Health, ignored or otherwise failed to correct known deficiencies in Cardinal Health's internal controls and procedures to prevent the diversion of prescription opioids for illegal use, including through inadequate responses to repeated red flags of the Company's non-compliance with applicable law. For example, in 2008, Cardinal Health settled allegations made by the Drug Enforcement Agency (the "DEA") that seven of Cardinal Health's 27 distribution facilities failed to comply with the Controlled Substances Act (the "CSA") and applicable DEA regulations (the "2008 Settlement"). Then, in 2012, Cardinal Health entered into another settlement with the DEA related to alleged deficiencies in the Company's anti-diversion controls at Cardinal Health's Lakeland, Florida distribution center (the "2012 Settlement"). Additional allegations of non-compliance with the CSA, federal law, and state law followed, including Congressional investigations and a multi-district litigation ("MDL") consolidating over 1,000 actions by various state and local governments pursuing damages claims against the Company in connection with the Company's opioid distribution practices.[2]

4.      On March 12, 2020, Plaintiffs filed their consolidated Complaint (defined below), claiming the Individual Defendants breached their fiduciary duties to Cardinal Health and otherwise wasted Company assets. Plaintiffs' vigorous prosecution of the Action ultimately resulted in an agreement to settle Plaintiffs' derivative claims for $124 million in cash paid by

---

[1] The individually named defendants in this action are David J. Anderson, Colleen F. Arnold, George S. Barrett, Carrie S. Cox, Calvin Darden, Bruce L. Downey, Patricia A. Hemingway Hall, Akhil Johri, Clayton M. Jones, Michael C. Kaufmann, Gregory B. Kenny, Nancy Killefer, David P. King, and J. Michael Losh (collectively, the "Individual Defendants," and together with nominal defendant Cardinal Health, "Defendants"). Defendants and Plaintiffs' Counsel are sometimes referred to herein as the "Parties."

[2] *In re Nat'l Prescription Opioid Litig.*, No. 1:17-MD-2804 (N.D. Ohio).

Defendants' insurers directly to the Company, subject to approval by this Court under Fed. R. Civ. P. 23.1(c) (the "Settlement").

5. The Settlement is the largest sole-credit cash settlement for any derivative action on behalf of an Ohio corporation and the largest sole-credit cash settlement in the history of the Sixth Circuit. The Settlement was achieved solely through the hard work and vigorous prosecution by Plaintiffs and their counsel. Plaintiffs believe the Settlement is fair, reasonable, and adequate, warranting approval by this Court. Plaintiffs further believe the significant recovery Plaintiffs and their counsel achieved for Cardinal Health justifies the fee and expense award (the "Fee and Expense Award") the Company has agreed to pay.

## II.      PROCEDURAL BACKGROUND OF THE ACTION

### A.      The Initial Complaint

6. On June 14, 2019, on behalf of Plaintiff Cohen, G&N filed a Verified Shareholder Derivative Complaint for Breach of Fiduciary Duties (the "Cohen Complaint"), ECF No. 1, against certain current and former members of the Board, alleging each had breached their fiduciary duties owed to Cardinal Health. Plaintiff Cohen alleged these fiduciaries ignored pervasive red flags of legal non-compliance and failed to ensure Cardinal Health complied with its affirmative duty to implement an effective anti-diversion program as required by the CSA and various settlements with the DEA in 2007, 2012, and 2016. The Cohen Complaint further alleged pre-suit demand on the Board would be futile because seven of the ten members of Cardinal Health's Board faced a substantial likelihood of liability for violating their fiduciary duties and were, thus, unable to fairly consider a demand.

7.      G&N came to the litigation having recently litigated a derivative case involving similar breach of fiduciary duty derivative claims against the directors of McKesson Corporation ("McKesson"), one of Cardinal Health's main competitors.[3]

8.      In advance of filing the Cohen Complaint, G&N conducted a thorough investigation of the facts underlying the allegations being made and Ohio corporate law standards that apply to Cardinal Health's Board.  Counsel reviewed filings that had been made on the MDL docket, numerous complaints filed against Cardinal Health, including complaints filed by the attorneys general and municipalities and in the MDL, declarations of the DEA agents who personally investigated the wrongdoing at Cardinal Health, congressional reports and testimony detailing the roles of Cardinal Health and its competitors in the opioid crisis, news media reports about Cardinal Health's role in the opioid crisis and the status of various litigations being waged against the Company, reports of the special committee of the Board to assess (and ultimately reject) prior litigation demands made on the Board in connection with the Company's role in the opioid crisis, and Company filings with the Securities and Exchange Commission ("SEC").

9.      G&N also performed legal research on the viability of breach of fiduciary duty claims based on lack of oversight in Ohio.  Specifically, counsel for Plaintiff Cohen was aware two similar complaints against the Board were previously dismissed.  *See Himmel v. Barrett*, No. 12CVA060663, 2013 WL 4719080 (Ohio Ct. Com. Pl. July 9, 2013); *Stanley v. Arnold*, No. 1:12-cv-482, 2012 WL 5269147, at *3, *7 (S.D. Ohio Oct. 23, 2012), *aff'd*, 531 F. App'x 695 (6th Cir. 2013).  Prior to filing a complaint, G&N researched the basis for these dismissals and the distinguishing factors that would make the Cohen Complaint viable.

---

[3] *In re McKesson Corp. Derivative Litig.*, No. 4:17-cv-1850-CW (N.D. Cal. Apr. 22, 2020) ("*McKesson*").

10. On September 20, 2019, Defendants filed a motion to dismiss the Cohen Complaint. One of Defendants' central arguments was that Plaintiffs' claims were barred by the statute of limitations. Cohen chose to file an amended complaint on December 6, 2019 (ECF No. 25 at PageID 1493) to preemptively address Defendants' contentions in lieu of opposing the motion to dismiss.

**B. Inspection Demand Pursuant to Ohio Rev. Code § 1701.37**

11. On July 25, 2019, on behalf of Plaintiff Malone, KTMC served on Cardinal Health a Demand for Inspection of Books and Records Pursuant to Section 1701.37 of the Ohio Revised Code and Ohio Common Law (the "Inspection Demand"), seeking the inspection of certain books and records related to Cardinal Health's anti-diversion policies and procedures, as well as the Board's oversight of the same. Throughout August and September 2019, KTMC and counsel for Cardinal Health, Wachtell, Lipton, Rosen & Katz ("Wachtell"), negotiated the production of documents to satisfy the Inspection Demand, as well as the terms of a confidentiality agreement, which was executed on September 12, 2019.

12. On September 20, 2019, Cardinal Health produced 265 documents in response to the Inspection Demand (the "Books and Records Production"), consisting principally of Board-level documents, including minutes and management presentations, concerning the Company's opioid distribution practices, as well as pending and threatened litigation and investigations related to the same. The Books and Records Production exposed numerous previously undisclosed facts that strongly supported Malone's claims. For example, the documents showed that with respect to the opioid epidemic, the Board typically focused on implementing a public relations strategy to change the narrative rather than fixing the problem. The minutes produced also showed the Board was obtaining very vague reports stating management was ensuring the anti-diversion program was being implemented, however, the minutes were devoid of detail and, despite repeated DEA

investigations, the minutes showed no evidence any Board member ever questioned the efficacy of the anti-diversion program.  The Books and Records Production showed this lack of inquiry led to serial underreporting of suspicious orders.  In fact, in 2018 it was discovered that since 2012, the Company had been relying on an automated system of reporting suspicious orders, replete with "system errors," resulting in gross under reporting.  No evidence was produced showing the Board requested an audit of the automated system or were even aware the system was automated until the error was uncovered in the face of congressional investigations.

13.     On December 13, 2019, after his counsel reviewed the Books and Records Production, Plaintiff Malone filed a complaint in this Court (the "Malone Complaint"), *Malone v. Anderson, et al.*, Case No. 2:19-cv-5442 (S.D. Ohio Dec. 13, 2019) (ECF No. 1 at PageID 1), asserting derivative claims against the Individual Defendants alleging breaches of fiduciary duties in connection with the Individual Defendants' deficient oversight of the Company's anti-diversion controls and suspicious order monitoring program.  The Malone Complaint further claimed a waste of corporate assets in connection with certain compensation paid to Cardinal Health's executive officers.

14.     On January 13, 2019, KTMC filed a second Verified Shareholder Derivative Complaint on behalf of Plaintiff Splaine, which similarly relied upon the Books and Records Production (the "Splaine Complaint") and pleaded the same claims as the Malone Complaint.  *See Splaine v. Anderson, et al.*, Case No. 2:20-cv-203 (S.D. Ohio Jan. 13, 2020) (ECF No. 1 at PageID 1).

**C.     The Consolidated Complaint**

15.     On January 16, 2020, Plaintiffs filed an unopposed motion to consolidate the actions.  Motion, ECF No. 30 at PageID 1557.  On January 28, 2020, the Court consolidated the three pending derivative cases into the Action.  Order, ECF No. 31 at PageID 1567.

16. KTMC and G&N then met and conferred regarding coordinating and consolidating their respective actions and working together on a unified basis to jointly prosecute the action on behalf of all Plaintiffs.

17. On February 7, 2020, Plaintiffs filed a motion to have their counsel appointed as co-lead counsel, and on February 11, 2020, the Court appointed KTMC and G&N as Plaintiffs' Co-Lead Counsel and appointed Isaac Wiles Burkholder & Teetor, LLC ("Isaac Wiles") and Strauss Troy Co., LPA ("Strauss Troy")[4] as Plaintiffs' Co-Liaison Counsel, and Mark Troutman, Esq. as Trial Attorney in the Action.[5]

18. On March 12, 2020, Plaintiffs filed an 83-page Consolidated Verified Shareholder Derivative Complaint (the "Complaint"), ECF No. 35 at PageID 1715, which remains the operative complaint in the Action.

19. The Complaint alleges the Individual Defendants, who are current and former members of the Board, failed to oversee the Company's system of controls designed to prevent the diversion of opioids to unlawful customers as required by the CSA.

20. Cardinal Health controls the second largest market share for prescription opioid distribution in the United States. Opioid distributors, like Cardinal Health, are required to adhere to the positive obligations of the federal regulatory scheme under the CSA, which requires distributors to "design and operate a system to disclose suspicious orders of controlled substances" and maintain "effective control against diversion of particular controlled substances" to non-legitimate channels requiring them to identify and report suspicious orders to the DEA.

---

[4] The attorneys working on this action at Isaac Wiles later changed firms and are now at Gibbs Law Group LLP ("Gibbs"). Mark Troutman, now associated with Gibbs, remains as the Trial Attorney for the Action.

[5] Pursuant to this February 11, 2020 order, KTMC and G&N are referred to herein as Co-Lead Counsel, and along with Isaac Wiles, Gibbs, and Strauss Troy, as "Plaintiffs' Counsel."

21.     The Complaint alleges since at least 2007, the Individual Defendants have knowingly allowed Cardinal Health to violate its obligations under the CSA and other applicable laws.  The Complaint cites numerous "red flags" including: a 2008 Settlement with the DEA, pursuant to which Cardinal Health agreed to pay a $34 million fine and maintain a compliance program designed to detect and prevent diversion of controlled substances in accordance with the CSA and applicable DEA regulations; a 2012 Settlement further mandated internal controls and the payment of a $44 million civil fine (that was finalized in a December 2016 agreement).

22.     Despite these red flags, Plaintiffs allege the Board continued its passive approach and failed to properly oversee its opioid distribution business.  The Complaint alleged the Board learned of continuing compliance deficiencies through complaints filed in various lawsuits nationwide and through Congressional investigations.   However, rather than address the deficiencies, the Complaint alleges the Board directed efforts toward lobbying and public relations efforts to change the narrative.

### D.     Motion to Dismiss Briefing, Argument, and Ruling

23.     On June 19, 2020, Defendants filed a Motion to Dismiss the Consolidated Verified Shareholder Derivative Complaint and Memorandum of Law in Support (the "Motion to Dismiss"), ECF No. 43 at PageID 1821.  Defendants argued, among other things, that (i) Plaintiffs should have, but did not make a pre-suit demand on the Board before bringing this derivative action, as required by Fed. R. Civ. P. 23.1(b)(3); (ii) Plaintiffs failed to state a claim for breach of fiduciary duty or waste under Ohio law; and (iii) Plaintiffs' claims were barred, in whole or in part, by issue preclusion and/or the four-year state of limitations in Ohio Rev. Code § 2305.09.

24.     On August 4, 2020, Plaintiffs filed a Memorandum in Opposition to Defendants' Motion to Dismiss the Consolidated Verified Shareholder Derivative Complaint, ECF No. 47 at PageID 2112.

25.    On September 18, 2020, Defendants filed a Reply Brief in Support of Motion to Dismiss the Consolidated Verified Shareholder Derivative Complaint, ECF No. 48 at PageID 2135.

26.    Between August 2020 and January 2021, Plaintiffs' Counsel prepared for oral argument on the Motion to Dismiss, which the Court heard on January 21, 2021.

27.    On February 8, 2021, the Court issued its Opinion and Order (the "MTD Opinion"), ECF No. 58 at PageID 2218, granting in part and denying in part the Motion to Dismiss.  The Court determined the Board's "failure to engage on the issue of CSA compliance, while receiving regular and clear indications that the problem persisted, supports an inference that these Individual Defendants acted, at least, with reckless disregard for Cardinal Health's best interests."[6]  The Court found that the earlier decisions in *Stanley* and *Himmel* did not establish a pleading-stage issue preclusion defense[7] and that Plaintiffs' claims were not time-barred.[8]  The Court granted the Motion to Dismiss as the waste claim, finding insufficient allegations of demand futility with respect to approval of executive compensation.[9]

28.    The Parties then submitted their Rule 26(f) Report, ECF No. 64 at PageID 2276, on March 18, 2021, and Judge Deavers held a preliminary pretrial conference on March 25, 2021.

29.    On March 25, 2021, Judge Deavers entered a Preliminary Pretrial Order requiring the production of documents by Defendants concerning initial disclosures by April 30, 2021 and setting other various deadlines in this Action.  Order, ECF No. 66 at PageID 2284.

---

[6] MTD Op., ECF No. 58 at PageID 2251.

[7] *Id.* at ECF No. 58 at PageID 2252-54.

[8] *Id.* at ECF No. 58 at PageID 2254-56.

[9] *Id.* at ECF No. 58 at PageID 2262-63.

### E. Negotiation and Institution of Discovery

30.     Plaintiffs initiated discovery the day after the pretrial conference.  On March 26, 2021, Plaintiffs served on Defendants Plaintiffs' First Request for Production of Documents.  On April 30, 2021, Defendants began producing additional documents pursuant to their initial disclosures.  On June 10, 2021, Cardinal Health and the Individual Defendants each filed Responses and Objections to Plaintiffs' First Request for Production of Documents.

31.     From May 2021 through August 2021, the Parties engaged in extensive negotiations regarding the scope, staging, and methods of discovery.  The Parties also negotiated confidentiality agreements, and an "ESI Protocol Agreement," which was executed on August 23, 2021.  These negotiations were similarly extensive and included many meet and confer sessions between the Parties.   In connection with these negotiations, Co-Lead Counsel engaged the assistance of an ESI expert to ensure the protocol accounted for the appropriate metadata required to obtain the full extent of a document's life.

32.     The meet and confer sessions regarding the discovery responses between counsel were contentious.  Each meet and confer call was typically preceded by and followed up with memorializing emails and letters narrowing the scope of discovery disputes.  The meet and confer process was particularly contentious because Co-Lead Counsel understood the legal standard in Ohio required more detailed evidence than what would likely be found in the "core documents" Defendants offered to produce.

33.     In order to ensure Co-Lead Counsel were effectively and efficiently using their resources, Co-Lead Counsel divided the workload.  For example, G&N led the meet and confer process with nominal defendant Cardinal Health and KTMC led the meet and confer process with the Individual Defendants.  This division of labor allowed the firms to work effectively to pursue discovery as to all Defendants contemporaneously and avoid unnecessary duplication.

34.     Simultaneously, Plaintiffs prepared and served three third-party subpoenas on August 4, 2021 and September 1, 2021, directed to Healthcare Distribution Alliance, a pharmaceutical distribution industry group, and Hill and Knowlton Strategies, LLC (f/k/a Public Strategies, Inc.) and Kekst and Co. Inc., two of the Company's public relations firms.

35.     In addition to negotiating bespoke search protocols, Plaintiffs demanded and received the substantial productions from the MDL proceedings, as such documents would directly relate to the alleged deficiencies in the anti-diversion and suspicious order monitoring programs at Cardinal Health.

36.     The earliest meet and confer sessions with Cardinal Health focused on accessing the documents produced in the MDL litigations.  Through these sessions, Co-Lead Counsel learned the MDL discovery was divided into "tracks."  Track I contained the documents relevant to all cases against Cardinal Health nationwide and local documents from the first bellwether trials. Track II documents were focused on state and municipal specific documents.

37.     Co-Lead Counsel argued these productions were easily accessible to Defendants, provided the core evidence about the Company's role in the opioid crisis and its anti-diversion policies and implementations, and could be quickly produced.  Defendants, however, explained that because Track I housed the discovery from the bellwether cases it would contain certain municipal specific documents that would not be relevant to Plaintiffs' claims against the Board. Defendants further argued if they were to produce MDL documents, no other discovery would be necessary.  Plaintiffs rejected this argument outright.

38.     Plaintiffs' Counsel, however, did not just want a document dump that would be time consuming to review yet not entirely relevant.  Thus, many of the meet and confer sessions

focused on the scope of the MDL Track I production and custodians whose documents were searched to create the production.

39.     Ultimately, the Parties agreed producing the entire Track I would be the most appropriate first step in the production process.

40.     Co-Lead Counsel demanded and obtained an index to the MDL production and a list of the custodians with each custodian's title and role at Cardinal Health.  This allowed Plaintiffs to narrow the scope of the production to the documents that would be most relevant to their claims and efficiently navigate through a large document production.

41.     Co-Lead Counsel also demanded and obtained a voluminous privilege log in connection with this production.

42.     At the same time Co-Lead Counsel engaged in extensive document review and analysis, Plaintiffs began a comprehensive process of preparing to: (i) continue to negotiate for more documents; (ii) review and analyze Defendants' privilege logs and potentially file motions seeking to break the privilege asserted; (iii) create document folders for expected witnesses and in preparation for depositions; (iv) defeat Defendants' inevitable motion for summary judgment; and (v) win at trial.

43.     To assist in document review efforts, Plaintiffs engaged a team of highly-skilled contract attorneys (the "reviewers").  Based on their level of experience and expertise, the reviewers were divided into teams with each team focused on the review of specific custodial documents.  The most experienced reviewers were tasked with reviewing documents produced by higher priority custodians.  KTMC had the existing infrastructure to best coordinate document review efforts and thus agreed to manage the reviewer teams.

44.     Before reviewing documents, reviewers were provided with a document review memorandum, summarizing the facts and history of the Action and explaining specific legal issues. Associates and partners were available to answer any questions reviewers may have as the reviewers prepared for their review.

45.     Document review in this Action was far more arduous than a typical "first-level" review.  Indeed, the volume and complexity of the documents necessitated careful consideration, closely analyzing each document's application to the claims at issue while also assessing how a given document fit into the larger case narrative.  With depositions looming, Plaintiffs' Counsel did not have time for excessive multi-level quality checks.  High-quality first level review was absolutely critical.

46.     As reviewers worked their way through the documents, associates and partners regularly communicated with each reviewer team, working collaboratively to assess the value of the documents reviewed and determine whether a team's effort was better redirected.  Based on these assessments and the use of smart technology available on the document hosting platform (e.g., artificial intelligence and eDiscovery analytics), staff attorneys created topic-specific searches.  Each search pulled specific documents from the larger production filtered by search terms, topics and issues, custodians, and/or date ranges, into a separate review folder.  Reviewers could then tailor their review to specific issues identified by first level reviewers and by associate and partner attorneys.

47.     Targeted searches enabled the reviewers to analyze the viability of particular case theories or factual allegations.  The process was iterative, requiring adjustments to the search filters if a given search was not productive.  In order to engage in this specialized review process, staff and associate attorneys prepared several sets of instructive memoranda tailored to certain specific

searches.  These iterative searches allowed the reviewers, and in turn, the associates and partners, to explore each avenue of interest.

48.     On a weekly basis reviewers compiled a set of their "best of" documents, providing summaries explaining why each hot document identified was important to Plaintiffs' claims. These "best of" sets were then circulated to the entire case team in advance of a weekly meeting.

49.     Partners, associates, and staff attorneys then met via Zoom with the reviewers to discuss the "best of" documents and to determine how those documents would be used to support Plaintiffs' claims.  These meetings provided the litigation team with the opportunity not only to develop case strategy incorporating documents in real time, but also to quality check the reviewers' work.

50.     The work performed by the reviewers and staff attorneys was invaluable to the prosecution of this Action and ensured that reviewing the voluminous production was completed in an efficient, cost-effective way without sacrificing the quality of review.

51.     All document review efforts were done with an eye toward summary judgment and trial.  Plaintiffs understood several of the underlying opioid cases had gone to trial, thus making a trial in this Action a real possibility.

52.     While document review efforts were ongoing, Co-Lead Counsel continued the meet and confer process.  Using the information gleaned from the reviewer's first-level review, Co-Lead Counsel sought more targeted discovery in the form of interrogatory responses and additional documents.  The evidence uncovered by the reviewers helped to support the litigation team in their meet and confer process to show examples of issues discovered that needed further exploration.

53.     Armed with this evidence Co-Lead Counsel successfully negotiated the production of all deposition transcripts and trial transcripts in opioid related cases against Cardinal Health.  In

addition, Co-Lead Counsel demanded and obtained the Individual Defendants' "chats" throughout the relevant time period.

54.     Ultimately, in addition to the Board-level documents produced as part of the Books and Records Production, Plaintiffs obtained over 15 million additional pages of documents, including deposition transcripts of certain key fact witnesses, electronic communications among personnel responsible for the Company's compliance programs, and written discovery responses on behalf of the Company from cases within the MDL proceedings.

55.     By staging discovery accordingly, Plaintiffs, acting nominally on behalf of Cardinal Health, ensured discovery in this matter would present limited disruptions to Cardinal Health's management and compliance-related personnel who had already provided testimony and relevant documents in connection with the MDL litigation, while ensuring Plaintiffs were fully informed regarding the key features, changes, and deficiencies in the Company's anti-diversion programs.

56.     Plaintiffs also sought the production of discovery concerning government actions pending against the Company from various state and federal agencies pursuant to 5 U.S.C. § 552 (the "Freedom of Information Act" or "FOIA") and related state open access laws.  This required additional research into the relevant state and federal statutory authorities for such requests, as well as the proper recipients of such requests.  By September 2021, Plaintiffs ultimately propounded FOIA requests to the Attorney General Offices in 42 states and to the DEA.  Co-Lead Counsel divided the workload with each firm propounding and negotiating with half of the states.

### F.     The MDL Global Settlement

57.     While Plaintiffs' discovery efforts were ongoing, on July 21, 2021, Cardinal Health, McKesson, and AmerisourceBergen Corporation ("AmerisourceBergen"), which together represent over 90% of the pharmaceutical distribution market, announced a proposed settlement

agreement that would, if certain terms were met, settle a substantial majority of the lawsuits filed against them in the MDL (the "MDL Global Settlement").

58.    Under the terms of the MDL Global Settlement, Cardinal Health, McKesson, and AmerisourceBergen would collectively pay $19.5 billion over an 18-year period, with Cardinal Health shouldering $6 billion of that amount.  The MDL Global Settlement also included injunctive relief terms, including governance reforms focused on diversion-related controls and director-level oversight of the same (the "MDL Governance Reforms").  By September 4, 2021, 42 states accepted the terms of the MDL Global Settlement.[10]

### G.    Mediation

59.    Though the Parties' Rule 26(f) Report contemplated a mediation following the close of all discovery, Plaintiffs and Defendants began discussing the possibility of a private mediation effort during discovery, so long as settlement-related discussions were kept on a separate track and did not delay the ongoing discovery process.  After discussing potential mediators, the Parties agreed to secure the assistance of two seasoned JAMS mediators, the Hon. Daniel Weinstein (Ret.) and Jed D. Melnick, Esq.[11]

60.    Prior to a full day mediation, the Parties participated in joint and *ex parte* telephonic sessions with the mediators and submitted extensive pre-mediation statements.  In total, the Parties

---

[10] As of August 11, 2022, 46 states, the District of Colombia, and 5 U.S. territories are parties to the MDL Global Settlement.  *See* Cardinal Health, Annual Report (Form 10-K) (Aug. 11, 2022), attached as Exhibit 1, hereto.

[11] Judge Weinstein and Mr. Melnick were two of the meditators used in connection with the *McKesson* derivative action alleging Delaware law breach of fiduciary duty claims for director oversight of opioid distribution practices at McKesson, the largest pharmaceutical distributor in the U.S.  *See* Joint Declaration of Daniel H. Weinstein and Jed Melnick in Connection with Proposed Stockholder Derivative Settlement ("Mediators' Decl."), ¶¶10-11, attached as Exhibit 2, hereto.

provided the mediators with almost 900 pages of briefing and exhibits related to the claims at issue in the Action.

61.     On December 9, 2021, Co-Lead Counsel, Defendants, and representatives of Defendants' insurers participated in a full-day, in-person mediation session in New York City. During the mediation session, Co-Lead Counsel presented arguments to the mediators, supported by the evidence uncovered in the discovery process.  As the day continued, the mediators determined a direct merits argument between the Parties, in the presence of all counsel—including counsel for the Individual Defendants' directors and officers ("D&O") insurers—would be useful. Counsel for all Parties then gathered and engaged in a head-to-head debate of the legal and factual merits of their respective positions.

62.     After 12 hours of adversarial negotiations, late in the evening of December 9 the Parties reached an agreement-in-principle to resolve the Action in return for a $124 million cash payment from Defendants' insurers to Cardinal Health (the "Settlement Amount").

63.     Following the mediation, the Parties engaged in protracted negotiations regarding the formal terms of the Settlement, including the scope of the release, mechanism for payment, and notice program.

64.     On May 5, 2022, the Company disclosed in its quarterly Form 10-Q filing with the SEC that the Parties had reached an agreement-in-principle to settle the litigation.

**H.     The Fee Negotiations**

65.     The Parties did not discuss fees to be paid to counsel for Plaintiffs during the mediation, other than to agree any such fee would be paid out of the Settlement Amount.  Only after the mediation and after the Parties reached agreement on all other material terms of the Settlement, Co-Lead Counsel and counsel for Cardinal Health started negotiations in an effort to reach agreement on Plaintiffs' Counsel's fee.

66.     This negotiation resulted in the Parties' agreement that Cardinal Health would pay Plaintiffs' Counsel 25% of the Settlement Amount, subject to Court approval.  During the fee negotiations, all Parties understood the Settlement would go forward even if no agreement on the fee was reached.  In that instance, Plaintiffs' Counsel would have been free to seek a fee greater than 25%.

67.     Notably, all three Plaintiffs' retention agreements with Co-Lead Counsel entitled Co-Lead Counsel to seek up to one-third of any recovery.  *See* Exhibits 3-5, attached hereto. Rather than face this risk, Cardinal Health agreed it would not oppose Plaintiffs' Counsel's request that they receive 25% of the Settlement Amount.[12]  After reaching agreement on fees, the Parties on May 25, 2022 executed the Stipulation and Agreement of Compromise, Settlement, and Release (the "Settlement Stipulation"), which Plaintiffs subsequently filed with the Court along with Plaintiffs' Unopposed Motion for Preliminary Approval of Proposed Settlement (the "Preliminary Approval Motion").  Preliminary Approval Motion, ECF No. 100 at PageID 3163; Settlement Stipulation, ECF No. 100-1 at PageID 3184.

## I.     Preliminary Approval and Dissemination of Notice to Cardinal Stockholders

68.     On July 18, 2022, the Court granted preliminary approval of the Settlement ("Preliminary Approval Order"), scheduled a settlement hearing on October 4, 2022, and approved the form and content of Notice to current Cardinal Health stockholders.  *See* Preliminary Approval Order, ECF No. 101 at PageID 3318.

69.     Pursuant to the Court's Preliminary Approval Order on July 22, 2022, the Company:  (1) issued a press release (the "Press Release"), which included the Court-approved

---

[12] In support of the Fee and Expense Award, Plaintiffs submit the opinion witness declaration of David Butler, an experienced litigator in this Court, which is attached hereto as Exhibit 6.

Summary Notice to Stockholders of Cardinal Health, Inc. of Proposed Settlement of Stockholder Derivative Action, Settlement Hearing, and Right to Appear (the "Summary Notice"); and (2) filed a Form 8-K filing with the SEC, detailing the claims at issue in the Action, and attaching as exhibits the Court-approved Notice to Cardinal Health, Inc. Stockholders of Proposed Settlement of Stockholder Derivative Action, Settlement Hearing, and Right to Appear (the "Notice"), the Summary Notice, and the July 22, 2022 press release.[13]

70.     On July 23, 2022, the Company published the Summary Notice in *The Wall Street Journal*.

71.     On July 25, 2022, G&N posted the Notice on its website.[14]

72.     On July 29, 2022, KTMC posted the Notice on its website.[15]

73.     As of the date of this Declaration, the undersigned are not aware of any Company stockholder intending to object to the Settlement.[16]

## III.    THE RELATIVE STRENGTHS AND WEAKNESSES OF PLAINTIFFS' CLAIMS FAVOR FINAL APPROVAL

74.     As the Court recognized in its MTD Opinion, Plaintiffs faced a high burden of establishing the Individual Defendants personal liability at trial:

> Directors of an Ohio corporation face personal liability only if shown by clear and convincing evidence that they acted with reckless disregard for the corporation's best interest, or with deliberate intent to cause injury to the corporation.  In failure of oversight cases, liability hinges on whether the directors ignore red flags that actually come to their attention warning of compliance problems.

---

[13] Cardinal Health, Inc., Current Report (Form 8-K) (July 22, 2022), attached hereto as Exhibit 7.

[14] *See* https://www.gardylaw.com/in-re-mckesson-corporation-derivative-litigation/.

[15] *See* https://www.ktmc.com/recent-settlements.

[16] There is a September 13, 2022 deadline to file objections.  Plaintiffs will separately respond to any objections that are filed.

ECF No. 58 at PageID 2246 (internal citations and quotations omitted).  This Ohio standard is much higher than the Delaware law standard, which requires a showing of substantial likelihood of success as opposed to clear and convincing evidence.  Even under the lower Delaware standard, oversight failure claims, such as were pleaded here, are notoriously difficult to prove.  With that in mind Co-Lead Counsel were well aware this case faced high obstacles at summary judgment or trial.

> ### A.    Plaintiffs' Breach of Fiduciary Duty Claim

> ### 1.    Plaintiffs' Position on Proving Liability

75.    At the time of the Settlement, Plaintiffs felt confident in their ability to prove to a factfinder that, even after June 2015—the limitations period prescribed by the Court (the "Limitations Period")—the Company's affirmative CSA compliance obligations and anti-diversion controls were deficient.  Among other obligations, the 2012 Settlement required that Cardinal Health (i) establish "new processes and practices" for order thresholds whereby "two-person concurrence will be required before increasing thresholds for high volume customers for specific drug classes"; and (ii) "enhance existing processes and practices for conducting due diligence reviews of pharmacies, chain and retail[.]"[17]

76.    Discovery revealed that by September 2015, management knew the Company's anti-diversion controls did not satisfy "the specific requirements outlined by the [2012 Settlement]."

77.    Discovery responses likewise supported Plaintiffs' allegations that Cardinal Health's system for identifying suspicious orders was inadequate.  First, Cardinal Health's system did not consider the volume of controlled substances shipped to a given pharmacy in relation to

---

[17] Complaint, ECF No. 35 at PageID 1763.

the region's population size, despite explicit DEA guidance to the contrary. As a result, Cardinal Health was shipping a disproportionately high number of pills to pharmacies located in geographies with populations that did not support the shipment volume. Second, Cardinal Health employed inconsistent levels of diligence when onboarding large "national-chain" customers and small pharmacy customers, increasing the likelihood certain pharmacies would slip through the Company's anti-diversion controls and receive unreasonably high shipments of opioids. Third, pharmacies that were likely diverting pills continued to receive opioids as Cardinal Health employees worked with customers to avoid triggering threshold levels, essentially manipulating an already inadequate internal control system.

78.     At the same time, as detailed in public sources and the company's Books and Records Production, there were "no fewer than 53 specific instances in which the Board or one of its relevant committees met to discuss or was otherwise notified of important information related to, compliance risks or issues in Cardinal Health's distribution of prescription opioids." MTD Opinion, ECF No. 58 at PageID 2256. Despite these Board-level red flags, throughout the Limitations Period, various state and local governments levied allegations of on-going deficiencies in the Company's anti-diversion controls. This, in turn, provides compelling evidence that the Board failed to properly address the numerous red flags of non-compliance that came to their attention and unreasonably relied upon reports by management and compliance personnel suggesting the Company had implemented an effective anti-diversion program.

79.     Thus, Co-Lead Counsel believed that their breach of fiduciary duty claims had significant record support in Board-level and management-level communications, as well as the already existing testimony of key compliance personnel.

### 2.    Risks to Establishing Liability

80.    Though the documentary record supported Plaintiffs' allegations that Cardinal Health's anti-diversion protocols were knowingly deficient, Co-Lead Counsel also recognized significant risks in proving liability.

81.    The Individual Defendants likely would have contended the Board, as a whole, relied on the responsible management and compliance personnel to implement, oversee, and improve (as necessary) Cardinal Health's anti-diversion controls.  The Individual Defendants would have argued they were statutorily entitled to rely on "information, opinions reports, or statements" provided by others on whom they reasonably believed they could rely.  Ohio Rev. Code §§1701.59(C) (as to a company's directors), 1701.641(B) (as to a company's officers).

82.    Towards that end, management's representations to the Board during quarterly updates and management presentations detailed the Company's efforts to comply with its obligations under the CSA and various DEA settlements, as well as efforts to engage with the DEA to ensure the Company was meeting expectations.  Within the Limitations Period, the Board further discussed various efforts by management to improve its anti-diversion controls—part of Cardinal Health's "Opioid Response and Strategy," which included: "continu[ing] [to] assess[] and improve[]anti-diversion controls program through execution of rigorous controls (e.g., enhancements to suspicious order monitoring process, 'Know Your Customer' site visits, new customer due diligence[,]" and "continu[ing] to asses business processes and procedures across the Pharmaceutical Segment related to handling of controlled substances to continually address evolution of the national opiate problem."

83.    In addition, the Board in 2018 formed a new committee dedicated to the oversight of opioid related matters and compliance issues.

84. Notably, on July 4, 2022, after the Parties in this Action agreed to the Settlement, the U.S. District Judge David A. Faber issued his opinion and findings of fact from the West Virginia bench trial against Cardinal Health and the other major U.S. opioid distributors. *City of Huntington v. AmerisourceBergen Drug Corp.*, Civil Action No. 3:17-01362, 2022 WL 2399876, at *19-20, *32-33 (S.D.W. Va. July 4, 2022). Crediting the testimony of various Cardinal Health compliance personnel, the Court ultimately ruled in favor of Cardinal Health (and McKesson and AmerisourceBergen). While Plaintiffs take no position on the correctness or propriety of that decision (or any appeal of such decision), Judge Faber's heavy reliance on the testimony of several members of Cardinal Health's compliance personnel regarding the Company's good faith efforts to implement an effective anti-diversion program demonstrate the risk in this Action of proving the Board misplaced its reliance on the same individuals in reckless disregard for the best interests of Cardinal Health.

85. Accordingly, there were significant risks to establishing Defendants' personal liability at trial.

## B. Damages and Collectability

86. Even if Plaintiffs successfully proved liability at trial, Plaintiffs faced the subsequent challenge of establishing damages in excess of the Settlement Amount due to the anticipated arguments concerning the statute of limitations and that future settlement payments would need to be discounted to present value. Importantly, the Action sought damages from the Individual Defendants (not from Cardinal Health), who would not have had the ability to satisfy a potential billion-dollar judgment.

### 1. Plaintiffs' Damages Theory

87. Since the Motion to Dismiss arguments and MTD Opinion, the potential damages at issue in the Action increased dramatically as a result of the MDL Global Settlement, which will

require Cardinal Health to pay $6 billion over an 18-year period, in addition to implementing certain governance reforms.

88.     At trial, Plaintiffs would have sought to recover, at a minimum, this full amount, in addition to any settlement payments, legal fees, or other payments related to alleged or settled compliance violations that occurred within the Limitations Period.  This includes, without limitation, $66 million paid to Summit and Cuyahoga Counties in Ohio in January 2020, and approximately $23.2 million paid to the Cherokee Nation's territory in Oklahoma in 2021.

89.     Likewise, Plaintiffs would have sought recovery of the costs Cardinal Health incurred to defend against opioid related litigation, including:  $65 million in FY 2019; $100 million in FY 2020; $115 million in FY 2021; and an estimated $125 million for FY 2022.

### 2.     Risks of Establishing Significant Damages

90.     Despite a potential high-dollar recovery following a successful trial, Co-Lead Counsel recognized the practical limitations of collecting a large judgment from the Individual Defendants, as well as the arguments Defendants would have made in support of a lower damages number.

91.     First and foremost, Co-Lead Counsel considered the risk that the Action would prove unsuccessful, resulting in no recovery for Cardinal Health.

92.     Second, Co-Lead Counsel recognized the difficulties inherent in actually collecting from individual corporate officers and directors the amount of damages that might be in excess of the available D&O insurance policies.

93.     Third, Co-Lead Counsel recognized the availability of various arguments Defendants could make limiting the absolute dollar amount of any recovery.  For example, in their Motion to Dismiss, Defendants argued Ohio's four-year statute of limitations limited the scope of

breaches (and damages) at issue in this Action.[18]  A post-trial recovery, thus, arguably could be limited to only those breaches of fiduciary duty that occurred and resulted in economic harm after June 2015.  The Court's MTD Opinion expressly stated the "Court does not disagree with the logic" of such limitations arguments.  ECF No. 58 at PageID 2254.  Co-Lead Counsel recognized the risk that the Individual Defendants would claim the multi-billion dollar MDL Global Settlement resolved claims for wrongdoing that also substantially pre-dated the Limitations Period. While Plaintiffs would argue the MDL actions alleged continuing wrongs through the present, there is a strong likelihood Defendants would be able to demonstrate the alleged breaches actually occurred prior to 2015.  Moreover, because Cardinal Health will fund the MDL Global Settlement across an 18-year period, the Individual Defendants likely would contend any future payment must be discounted to a much lower present value.

94.     Thus, in comparison to Plaintiffs' claim that the Individual Defendants caused over $7 billion of damages, the Individual Defendants would have likely contended at trial, in reliance on expert testimony, the present value of the economic damages Cardinal Health suffered for misconduct that occurred within the Limitations Period were substantially below $1 billion.

95.     In addition, no matter how large the judgment, what mattered to the Company was what it could collect—which was primarily a function of the available insurance, and given the amount available, the recovery in the Settlement is very substantial.

96.     Here, the Individual Defendants were protected by several layers of D&O insurance.  In the event of a final, non-appealable judgment finding Defendants breached their

---

[18] *See In re Keithley Instruments, Inc. Derivative Litig.*, 599 F. Supp. 2d 875, 907 (N.D. Ohio 2008).

fiduciary obligations however, the D&O carriers would likely also have significant coverage defenses.

97.     Plaintiffs did not see any realistic possibility of recovering meaningful amounts from the Individual Defendants' personal assets.  The Individual Defendants are all very wealthy people by the standards of ordinary Americans, but none had sufficient assets available to satisfy a ten-figure judgment.

98.     The $124 million Settlement uses a substantial amount of Defendants' remaining available insurance,[19] which Plaintiffs reasonably determined represented   the primary source of any recovery on the scale of the damages alleged.

## IV.     THE SETTLEMENT CONFERS A SUBSTANTIAL AND IMMEDIATE BENEFIT UPON CARDINAL HEALTH AND ITS STOCKHOLDERS

### A.     The Settlement Reflects a Fair, Reasonable, and Adequate Compromise

99.     In light of the foregoing considerations regarding establishing liability and damages, Co-Lead Counsel believe the Settlement reflects a fair, reasonable, and adequate compromise of the derivative claims in the Action.

100.     Plaintiffs were further well aware of the strengths and weaknesses of their claims at the time of the Settlement.  Plaintiffs had received millions of pages in discovery, including over 15 million pages of Company records produced in the MDL, deposition transcripts of key compliance and anti-diversion personnel, Board-level documents and presentations, trial transcripts, and reports and presentations prepared by third-party advisors to the Company concerning Cardinal Health's role in the opioid crisis.

---

[19] The total amount of the policies and the remaining amounts that existed at the time of the Settlement are confidential.  However, those amounts can be supplied to the Court *in camera* upon request.

101.     Though the Parties had not completed all discovery at the time they agreed to the Settlement, Co-Lead Counsel did not believe additional discovery would mitigate the risks evident in the Individual Defendants' principal "reliance on management" defense or damages arguments. Depositions were not likely to improve Plaintiffs' case; rather, Plaintiffs expected each Individual Defendant to credibly explain that he or she used his or her best efforts to implement effective anti-diversion protocols on behalf of Cardinal Health.

102.     Most fundamentally, Co-Lead Counsel also considered the risks that the litigation would not resolve successfully, even if the matter were litigated further. Though Co-Lead Counsel did not anticipate significant risk of losing at summary judgment, there was considerable risk Plaintiffs would not carry their heavy trial burden. Oversight claims are "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment."[20]

**B.     The Settlement Amount Paid Directly to the Company Is Significant**

103.     The Settlement confers a quantifiable, substantial benefit upon Cardinal Health and its stockholders: a $124 million payment directly to the Company, which is significant in absolute and relative terms.

104.     As noted above, the $124 million Settlement represents a significant recovery of the damages the Individual Defendants likely would have claimed Plaintiffs could recover for harms within the Limitations Period, when discounted to present value and before taking into account the risk of losing at trial.

105.     The Settlement Amount also compares favorably to the recovery achieved in the *McKesson* derivative action involving a significantly larger nationwide distributor of opioids. In December 2019, McKesson announced it settled the *McKesson* litigation in exchange for $175

---

[20] *In re Caremark Int'l, Inc. Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996).

million in cash, funded exclusively by insurance, along with certain corporate governance reforms. The *McKesson* case settled at a similar procedural posture as this case, during document discovery and prior to depositions. While the absolute dollar amount of the recovery was larger, McKesson is significantly larger than Cardinal Health,[21] and controls a greater share of the opioid pharmaceutical distribution market than Cardinal Health. McKesson has also agreed to pay more than $1 billion more than Cardinal Health as part of the MDL Global Settlement.

106.    Further, the specific oversight claims at issue in the *McKesson* case presented less risk for a successful trial result. The *McKesson* case alleged a "*Caremark* Prong II" claim under Delaware law, imposing liability where directors "consciously failed to monitor or oversee [the Company's] operations thus disabling themselves from being informed of risks or problems requiring their attention,"[22] which the Plaintiffs could show by pointing to "red flags" and a subsequent failure to act in the face of such information.[23] In comparison, this Action and the legal standard under Ohio law would have required clear and convincing proof that the Individual Defendants recklessly disregarded Cardinal Health's best interests, notwithstanding documented enhancements to the Company's anti-diversion controls during the limitations period and Board-level presentations by management establishing the same. Put differently, a successful trial in the *McKesson* case would require proof the Board was not discussing the problem in significant detail, while a successful trial in this Action would require Plaintiffs to prove the much harder case that the Cardinal Health Board was discussing the problem in bad faith or with a management team upon which the Board unreasonably misplaced their reliance.

---

[21] As of August 29, 2022, Cardinal Health's market capitalization was $19 billion, while McKesson's was $52.2 billion.

[22] *Stone ex. rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006).

[23] *See South v. Baker*, 62 A.3d 1, 15 (Del. Ch. 2012).

**C.     The Injunctive Relief Terms of the MDL Global Settlement Should Prevent Further Recidivism and Increase Board Level Oversight**

107.    Before agreeing to the Settlement, Co-Lead Counsel also considered the governance terms of the MDL Global Settlement, which will require Cardinal Health to coordinate more effectively with regulators and other opioid distributors to prevent diversion and identify suspicious orders, as well as greater oversight of the anti-diversion program by executive management and the Board.

108.    Both prior to and following the mediation, Co-Lead Counsel analyzed the potential benefits of additional governance reforms that might be achieved as part of the Settlement.  During the Stipulation negotiation process Plaintiffs sought Defendants' commitment that the Board and Company would implement the MDL Governance Reforms even if the MDL Global Settlement did not become final.  On February 25, 2022, while the Parties were still negotiating key terms of the Stipulation, Cardinal Health, McKesson, and AmerisourceBergen each determined to proceed with the MDL Global Settlement, mooting the need for such additional assurances in the Settlement.

109.    The governance and injunctive relief provisions of the MDL Global Settlement, though not a part of the consideration exchanged in this Action, further support Co-Lead Counsel's belief that this Settlement is fair, reasonable, and adequate and in the best interests of Cardinal Health and its stockholders, and that the failures that resulted in the claims asserted in this Action have been remediated through improved governance and are unlikely to be repeated.

**V.     PLAINTIFFS' COUNSEL'S LITIGATION EFFORTS**

110.    Both KTMC and G&N are skilled law firms in the field of complex litigation and maintain a track record of national success in representing investors in derivative class actions. *See* Exhibits 8-9.  Gibbs and Strauss Troy also offered important litigation support and insights.

111.    The hours dedicated to the prosecution of the Action are reflected in the attached Exhibits 8, 9, 10 and 11.  These Exhibits reflect Plaintiffs' Counsel expended a total of 19,786.75 hours litigating and settling the Action, for a combined lodestar of $8,865,781.00, as follows:

| FIRM | HOURS | LODESTAR |
|---|---|---|
| KTMC | 14,787.75 | $5,993,343.75 |
| G&N | 4,565.25 | $2,582,252.50 |
| Gibbs | 146.10 | $91,243.50 |
| Strauss Troy | 287.65 | $198,941.25 |
| **TOTALS:** | **19,786.75** | **$8,865,781.00** |

112.    Exhibits 8, 9, 10 and 11 also reflect Plaintiffs' Counsel's unreimbursed expenses. These Exhibits reflect Plaintiffs' Counsel expended a total of $209,471.27 in reasonable litigation expenses.  Plaintiffs' Counsel seeks reimbursement of these amounts as part of the total 25% "all in" Fee and Expense Award.

113.    After deducting the unreimbursed litigation expenses, the Fee and Expense Award equates to a lodestar multiplier of 3.47x on Plaintiffs' Counsel's time.

## VI.    OTHER EXHIBITS

114.    The following exhibits cited to in Plaintiffs' Motion for Final Approval of Derivative Settlement and Application for an Award of Attorneys' Fees and Expenses are attached hereto as follows:

| Ex. | Date | Description |
|---|---|---|
| 12 | 8/23/2022 | Final Judgment Approving Settlement and Order of Dismissal, *Emps. Ret. Sys. of the City of St. Louis, et al. v. Jones, et al.*, No. 2:20-cv-04813 (S.D. Ohio Aug. 23, 2022), ECF No. 196 at PageID 5074. |
| 13 | 9/24/2021 | Mem. of Law in Supp. of Class Counsel's Mot. for an Award of Attys' Fees and Expenses and Award to Pl. Pursuant to 15 U.S.C. § 78u-4(a)(4), *Grae v. Corr. Corp. of Am.*, No. 3:16-CV-02267 (M.D. Tenn. Sept. 24, 2021), ECF No. 469 at PageID 25019. |
| 14 | 1/17/2017 | Transcript of Settlement Proceedings, *In re Cmty. Health Sys., Inc. S'holder Derivative Litig.*, No. 11-cv-00489 (M.D. Tenn. Jan. 17, 2017). |
| 15 | 7/3/2022 | Patrick Smith, *Big Law Gears Up for Likely 8-Figure Legal Battle Between Twitter, Musk*, THE AMERICAN LAWYER (July 3, 2022). |
| 16 | 2/23/2022 | Settlement Hearing and Ruling of Court, *In re Boeing Co. Derivative Litig.*, C.A. No. 2019-0907-MTZ (Del. Ch. Feb. 23, 2022), ECF No. 122-3 at PageID 2760. |
| 17 | 6/28/2018 | Decl. of David L. Wales in Supp. of Pls.' Unopposed Mot. for an Award of Attys' Fees and Reimbursement of Expenses, *In re Big Lots, Inc. S'holder Litig.*, No. 2:12-CV-445 (S.D. Ohio June 28, 2018). |
| 18 | 12/14/2021 | Decl. of Manisha M. Sheth in Supp. of P's Mot. for an Award of Attys' Fees Inclusive of Expenses, *Rudi v. Wexner*, No. 2:20-CV-3068 (S.D. Ohio May 16, 2022) ("*L Brands*"), ECF No. 26-9 at PageID 1079-1080. |

## VII. CONCLUSION

115. We respectfully submit the Settlement is more than fair, reasonable, and adequate, and Plaintiffs' Counsel's unopposed request for 25% of the Settlement Amount is reasonable in light of the benefits created by the initiation, prosecution, and settlement of this complex Action. We respectfully ask the Court to approve the Settlement and the Fee and Expense Award.

We declare under penalty of perjury that the foregoing is true and correct.  Executed on

August 29, 2022.

*/s/ Eric L. Zagar*
ERIC L. ZAGAR


*/s/ Jennifer Sarnelli*
JENNIFER SARNELLI

## CERTIFICATE OF SERVICE

I hereby certify that on August 30, 2022, a copy of the foregoing document was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/Mark H. Troutman*
Mark H. Troutman (0076390)
mht@classlawgroup.com
*Trial Attorney for Plaintiffs*
